UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CAPPSEALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DIRECT MARKETING CONCEPTS, INC., | ) | C.A. No. 05-11907-JLT |
| ITV DIRECT, INC., DIRECT | ) | |
| FULFILLMENT, LLC, DONALD | ) | |
| BARRETT, and ROBERT MAIHOS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF CAPPSEALS INC.'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, plaintiff Cappseals, Inc. ("Cappseals") submits this

Memorandum of Law in support of its Motion for partial summary judgment on its claims against

Direct Marketing Concepts, Inc. ("DMC"). Specifically, Cappseals requests that the Court declare

that DMC is a co-obligor of the same debt that resulted in the judgment that this Court issued

against ITV Direct, Inc. ("ITV" or the "Judgment Debtor") on August 3, 2005 (the "Judgment") in a

related proceeding, *ITV Direct, Inc. v. Healthy Solutions, LLC et al*, C.A. No. 04-CV10421-JLT (the

"Related Action"). Because the Judgment has not been satisfied, Cappseals requests a separate

judgment against DMC so that it can make further attempts to collect the debt owed by the

defendants that has remained outstanding for over eighteen months.

From what little post judgment discovery that Cappseals has been able to conduct in the

Related Action, it is clear that ITV drained its bank accounts and ceased operations concurrently

with this Court's summary judgment decision issued on July 20, 2005.[1] Accordingly, Cappseals has

initiated this action to overcome the defendants' shell game and recover the defendants' debt from

---

[1] ITV's significant reduction in operations also came while Cappseals' Motion for Post-Judgment Relief was pending.

DMC – another owner of the debt and the alter ego of the Judgment Debtor.  This Motion seeks to expedite that process because liability is so clear.

In the Related Action, this Court ruled that a purchase order issued by ITV gave rise to Cappseals' right to payment on the goods shipped to and accepted by the defendants.[2]  As detailed herein, DMC issued an *identical* purchase order requesting the exact same goods that were eventually manufactured and shipped by Cappseals.  The plain language of the purchase order, and DMC's actions subsequent to *its* issuance of the purchase order, show that DMC was a party to the contract recognized by the Court and is equally liable for the payment obligation memorialized by the Judgment. Where "the purchase order…created [the buyer's] obligation to pay for the specific goods purchased and accepted,"[3] DMC, as *the issuer of the purchase order,* is also liable for payment of the goods delivered and accepted.

In the alternative, the Court should consider DMC and ITV to be alter egos of one another. Any distinction between the two companies is a fiction created by the entities' sole shareholders, Donald Barrett and Robert Maihos, who have manipulated ITV and DMC in an obvious effort to avoid liability for the Judgment. This Court should look through this fiction and eliminate the last remaining obstacle to Cappseals' entitlement to payment of the debt owed by both parties.  More precisely, Cappseals' only asks for what ITV's owner Robert Maihos, has already offered to the Federal Trade Commission ("FTC") when it sought to appoint a receiver over DMC and ITV:

> *DMC and ITV* have other profitable operations and business that is unrelated to …Supreme Greens.  The profit from these operations, as well as any recovery on *DMC's and ITV's* indemnification claims, could be used to satisfy any judgment or settlement obtained by the FTC.[4]

---

[2] For the convenience of the Court, a true and accurate copy of the Court's July 20th Memorandum is attached to the Affidavit of Scott Silverman as **Exhibit A**.

[3] Memorandum, p. 5 (Silverman Aff., **Exhibit A**).

[4] See the Affidavit of Robert Maihos, dated June 4, 2004, ¶17 (emphasis added).  A true and accurate copy of the Maihos Affidavit filed in the matter of *Federal Trade Commission v. Direct Marketing Concepts, Inc. et al*, Civil Action No. 04-11136-GAO (the "FTC Action") is attached to the Affidavit of Scott Silverman as **Exhibit B**.

Accordingly this Court should grant Cappseals' request for partial summary judgment by issuing a declaratory judgment pursuant to Count IV of its Complaint that DMC is liable for the purchase order debt, and, declare under Count V of the Complaint that DMC is the alter ego of ITV.

## I.    RELATED PROCEDURAL HISTORY

On August 3, 2005, this Court issued the Judgment against ITV and Direct Fulfillment, LLC ("Direct Fulfillment") in favor of Cappseals in the amount of $1,041,684.49.  The Judgment was entered pursuant to the Court's July 20, 2005 Memorandum allowing Cappseals' Motion for Summary Judgment (the "Memorandum").  In the Memorandum the Court determined that "there is no just reason to further delay payment for goods ***delivered, accepted and re-sold***."[5]    The Memorandum was based in part on stipulated facts with respect to shipments of a product to the defendants that was manufactured by Cappseals (the "Shipments").  Cappseals' unsuccessful effort to execute on the Judgment, due entirely to the defendants' manipulations of ITV's financial assets, has led to the commencement of this suit in an effort to collect the amount owed.

## II.    MATERIAL FACTS[6]

### A.    DMC and ITV Ordered Goods.

Between December 2003 and February 2004 ITV received six shipments of a health supplement called Supreme Greens with MSM (the "Product") from a company named Healthy Solutions (d/b/a Direct Business Concepts).  Memorandum, p. 1.  These shipments resulted from a "standing" purchase order numbered 1101 that was issued on November 21, 2003 by both DMC and ITV, for the production and delivery of 50,000 units of the Product per week ("Purchase Order

---

[5] Memorandum, p. 6 (emphasis added).  (Silverman Affidavit, **Exhibit A**.)

[6] The facts described herein are supported Cappseals' Concise Statement of Material Facts submitted herewith.  Some of the facts come from the Joint Stipulations of Fact in the Related Action.  The Joint Stipulations are attached to the Affidavit of Scott Silverman as **Exhibit C**.  Many of the facts detailed herein were also adopted by the Court within the Memorandum.

1101").[7]  Healthy Solutions then engaged Cappseals to manufacture all of the Product shipped, delivered and accepted pursuant to Purchase Order 1101.  Memorandum, p. 2.

**B.     Healthy Solutions Billed Both DMC And ITV For The Product.**

Pursuant to Purchase Order 1101, at the request of Healthy Solutions, Cappseals manufactured and delivered the Product to ITV.  Joint Stipulations ¶7 (Silverman Aff., **Exhibit C**). Healthy Solutions issued six (6) invoices to DMC and ITV for the Shipments under Purchase Order 1101.  The invoices, numbered 21 through 26, were made in the amounts of:  (1) $300,078.00 for the December 29, 2003 shipment of the Product; (2) $185,472.00 for the January 5, 2004 shipment of the Product; (3) $323,712.00 for the January 14, 2004 shipment of the Product; (4) $376,146.00 for the January 21, 2004 shipment of the Product; (5) $318,216.00 for the January 29, 2004 shipment of the Product; and (6) $318,240.00 for the February 5, 2004 shipment of the Product (collectively the "Invoices").[8]  The total price of the goods delivered in response to Purchase Order 1101 and invoiced by Healthy Solutions was $1,821,864.00.  All of these Invoices referenced Purchase Order 1101.  Neither DMC nor ITV paid any of the Invoices.  Memorandum, p. 1. Furthermore, Cappseals was never paid for the Product which it manufactured.  Memorandum, p. 2.

**C.     DMC Carried The Revenue And Costs Of The Product On Its Own Books.**

After several motions to compel in the Related Action (and a motion for sanctions) ITV and DMC produced an accounting report dated August 16, 2004 (the "Accounting Report") disclosing the financial status of ITV and DMC as well as financial information relating to their sales of the Product.[9]  The Accounting Report indicates that the Product inventory was eventually transferred on the books and records to DMC which was credited for making payment for the Product to Healthy

---

[7] True and accurate copies of both purchase orders produced by ITV and Healthy Solutions in the related proceeding are attached as **Exhibit D** to the Affidavit of Scott Silverman.
[8] True and accurate copies of Invoices Nos. 21 – 26 are attached collectively as **Exhibit E** to the Affidavit of Scott Silverman.
[9] A true and accurate copy of the Accounting Report is submitted herewith as **Exhibit F** to the Affidavit of Scott Silverman.

Solutions/Direct Business Concepts.  See Accounting Report tab 6, (Silverman Affidavit, **Exhibit F, tab 6**).  More specifically, on a report titled "***Direct Marketing Concepts, Inc., Supreme Greens Accounting, Costs of Supreme Greens Product Sold***" DMC provides the detail on $4,647,698.61 in costs *it* incurred in acquiring the Product.  Within this list are entries that identically match the Invoices identified above including the Invoice numbers, dates and the $1,821,864.00 owed for shipments pursuant to Purchase Order 1101.  See Accounting Report tab 6, (Silverman Affidavit, **Exhibit F, tab 6**).  An excerpt from tab 6 is shown below:

| **Trans #** | **Type** | **Date** | **Number** | **Name** | **Debit** |
|---|---|---|---|---|---|
| 16,690 | Bill | 12/31/2003 | 21 | Direct Business Concepts[10] | $300,078.00 |
| 16,691 | Bill | 01/09/2004 | 22 | Direct Business Concepts | 185,472.00 |
| 16,692 | Bill | 01/14/2004 | 23 | Direct Business Concepts | 299,520.00 |
| 16,692 | Bill | 01/14/2004 | 23 | Direct Business Concepts | 24,192.00 |
| 16,693 | Bill | 01/21/2004 | 24 | Direct Business Concepts | 345,600.00 |
| 16,693 | Bill | 01/21/2004 | 24 | Direct Business Concepts | 30,546.00 |
| 16,997 | Bill | 01/29/2004 | 25 | Direct Business Concepts | 288,000.00 |
| 16,997 | Bill | 01/29/2004 | 25 | Direct Business Concepts | 30,216.00 |
| 17,074 | Bill | 02/06/2004 | 26 | Direct Business Concepts | 288,000.00 |
| 17,074 | Bill | 02/06/2004 | 26 | Direct Business Concepts | 30,240.00 |

Similarly, ITV has produced another document from DMC's accounting records that also identifies the costs DMC incurred for acquiring the Product.  This report provides additional information including the fact that the debts owed pursuant to the Invoices (Numbers 21 through 26) were associated with Purchase Order 1101, and, a notation indicating the invoices were "not

---

[10] Direct Business Concepts is a d/b/a for Healthy Solutions.

paid" by DMC.[11]  A true and accurate excerpt from the report from DMC's accounting records is shown below:

| Trans # | Type | Date | Number | Name | Debit |
|---------|------|------|--------|------|-------|
| 16,690 | Bill | 12/31/2003 | 21 | Direct Business Concepts | $300,078.00 |
| 16,691 | Bill | 01/09/2004 | 22 | Direct Business Concepts | 185,472.00 |
| 16,692 | Bill | 01/14/2004 | 23 | Direct Business Concepts | 299,520.00 |
| 16,692 | Bill | 01/14/2004 | 23 | Direct Business Concepts | 24,192.00 |
| 16,693 | Bill | 01/21/2004 | 24 | Direct Business Concepts | 345,600.00 |
| 16,693 | Bill | 01/21/2004 | 24 | Direct Business Concepts | 30,546.00 |
| 16,997 | Bill | 01/29/2004 | 25 | Direct Business Concepts | 288,000.00 |
| 16,997 | Bill | 01/29/2004 | 25 | Direct Business Concepts | 30,216.00 |
| 17,074 | Bill | 02/06/2004 | 26 | Direct Business Concepts | 288,000.00 |
| 17,074 | Bill | 02/06/2004 | 26 | Direct Business Concepts | 30,240.00 |

Finally, the revenues and profits generated from sales of the Product have solely been attributed to DMC in its financial records. Accounting Report tab 1, (Silverman Affidavit, **Exhibit F, tab 1**).  In fact, the Accounting Report indicates that DMC generated revenues exceeding $16 million associated with sales of the Product through June 2004.  Accounting Report tab 14, (Silverman Affidavit, **Exhibit F, tab 14**).  This significant revenue has lead to net assets of $4.6 million (approx.) for DMC as of June 2004.  Accounting Report tab 14, (Silverman Affidavit, **Exhibit F, tab 14**).[12]

---

[11] A true and accurate copy of the report from DMC's accounting records produced by ITV with a bates label ITV00291 is submitted herewith as **Exhibit G** to the Affidavit of Scott Silverman.

[12] Despite this Court's ruling on Cappseals' Motion for Post-Judgment Relief on October 24, 2005, the defendants have failed and refused to provide any up to date information relating to DMC's current financial status.

While DMC has generated significant assets through sales of the Product, at the same time, ITV has served as nothing more than a "pass-through." The Accounting Report indicates that the strategy implemented by the defendants left ITV with a negative balance sheet, showing a deficit of $93,450 as of June 2004. Accounting Report tab 15, (Silverman Affidavit, **Exhibit F, tab 15**).[13]

**D.      The Defendants Manipulate The Financial Assets Of ITV And DMC.[14]**

Despite this financial deference to DMC, until recently, the defendants were still transacting business through ITV. However, commensurate with the Judgment ITV's operations declined precipitously. ITV's general ledger shows that on average ITV recorded 398 transactions per month during May, June and July, 2005.[15] From July 20, 2005 – the date of the summary judgment Memorandum – through the printing of the General Ledger on September 30, 2005 (2 ½ months) ITV recorded a ***total*** of 9 transactions. Five of these were transactions with DMC totaling $360,000. ITV's bank statements tell a similar story with it averaging $1.8 million flowing in and out of its accounts during the months of May, June and July, 2005 whereas that number dropped to $100,000 in August.[16]

In short, ITV financial records show that after this Court issued the Judgment, ITV stopped doing business.

**E.      ITV And DMC Are Operated As A Single Entity.**

While these accounting activities indicate a strategy of debt avoidance, the company's principal, Donald Barrett, confirmed the strikingly similar ownership and management structure between the related entities that contradicts any real corporate "separation."

---

[13] Despite this Court's ruling on Cappseals' Motion for Post-Judgment Relief on October 24, 2005, the defendants have failed and refused to provide any up to date information relating to DMC's current financial status.

[14] Many of the facts with respect to the defendants' dissipation and transfer of assets are supported by the findings of the Court in the case of *Federal Trade Commission v. Direct Marketing Concepts, Inc. et al*, Civil Action No. 04-11136-GAO (the "FTC Action"). A true and accurate copy of the Preliminary Injunction Order issued in the FTC Action is attached to the Affidavit of Scott Silverman as **Exhibit H**.

[15] The relevant portions of ITV's general ledger are attached to the Silverman Affidavit as **Exhibit I**.

[16] ITV's bank statement for May, June, July and August 2005 are collectively attached as **Exhibit J** to the Silverman Affidavit.

A:  I own a company called ITV Direct and Direct Marketing Concepts along with my business partner.
Q:  What do you do for ITV Direct?
A:  I host the infomercial aspect of the direct response business.
Q:  Do you have any title for your work at ITV Direct?
A:  My title is present and CEO.
Q:  Are you a shareholder?
A:  Yes, I am.
Q:  What percentage of the shares do you own?
A:  I believe fifty percent.
Q:  You mentioned a business partner.  Who is that?
A:  His name is Robert Maihos, M A I H O S.
Q:  What percentage of shares does he own?
A:  The other fifty percent.
Q:  What about Direct Marketing Concepts, what do you do for them?
A:  The same thing.
Q:  When you say "the same thing" would you describe your duties for me.
A:  The Direct Marketing Concepts was the original company that we started. ITV Direct was a company that I started to actually produce the infomercials. Direct Marketing Concepts doesn't produce the infomercials any more, they are mainly the company that answers the telephones.
Q:  Do you have a title at Direct Marketing Concepts?
A:  It would be the same, president and CEO.
Q:  Do you own some shares in Direct Marketing Concepts?
A:  Exact same as Direct Marketing Concepts.  Same as ITV Direct, rather.

Barrett Dep. pp. 6 – 7. [17]

Even Donald Barrett, the President of both ITV and DMC, mixed up the two companies.

Mr. Barrett's confusion did not end with ownership issues, he was also incapable of distinguishing

who his employees worked for, and, whether ITV or DMC paid their salaries:

Q:  So you built the business from six telephones in the garage, and how large is ITV Direct now?
A:  We have about 200 employees give or take.
Q:  Is that ITV Direct, or is that Direct Marketing Concepts?
A:  Both.  I'm not sure which.  I think everyone is paid out of Direct Marketing Concepts.

Barrett Dep. p. 13.

---

[17]    The relevant pages from the transcript of Mr. Barrett's August 23, 2004 deposition are attached to the Affidavit of Scott Silverman as **Exhibit K**.

Testimony from Mr. Barrett's deposition also addresses the reasons for establishing ITV as well as the absence of any meaningful difference between ITV and DMC:

> Q:  I want to make sure I understand this.  ITV Direct essentially produces the infomercials, and Direct Marketing Concepts answers the phone, places the orders, that sort of thing, is that a fair statement?
>
> A:  I really came up with ITV Direct because I liked the name more.  I kind of weaseled, not weaseled but said ITV Direct, we can use that it for the production end of it and we'll use Directing Marketing Concepts for the bank end of the business.  I liked the ITV name.  It incorporated TV.  I just liked the name better.  That's frankly why I did it.

Barrett Dep. pp. 10-11.[18]

By Mr. Barrett's own admission, there is no material distinction between DMC and ITV. Moreover, in a recent lawsuit against the Federal Trade Commission ("FTC") filed jointly by DMC, ITV and Donald Barrett on October 11, 2005 the parties state that the principal place of business for DMC and ITV is the same, 55 Cherry Hill Drive, Beverly Massachusetts, a fact that belies any argument that DMC and ITV are separate.[19]

## III.    ARGUMENT

### A.    Summary Judgment Standard.

Summary judgment is proper where there are no genuine issues of material fact.  See *Corellas v. Viveiros,* 410 Mass. 314, 317 (1991).  A "genuine issue" for summary judgment purposes exists only when there is evidence that "a reasonable jury drawing favorable inferences" could resolve it in favor of the non-moving party.  *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 32 (1st Cir. 2000) citing *Smith v. F.W. Morsely & Co.*, 76 F.3d 413, 427 (1st Cir. 1996). "One of the principal purposes of the Summary Judgment rule is to isolate and dispose of factually unsupported claims and defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Thus, summary judgment enables parties to avoid an unnecessary trial when only one outcome can ensue.

---

[18] Silverman Affidavit, **Exhibit K**
[19] See *Direct Marketing Concepts, Inc., et al, v. the Federal Trade Commission*, Civil Action No. 05-11930GAO, Complaint, ¶¶ 2-3.  A true and accurate copy of the Complaint is attached to the Silverman Affidavit as **Exhibit L**.

*Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 806 (Fed. Cir.1999). The Court should enter summary judgment if the nonmoving party fails to demonstrate through the affirmative production of probative evidence that a genuine issue of material fact remains in dispute. See Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 27.

Applying the foregoing legal standard to the facts in this case, the undisputed facts demonstrate that Cappseals is entitled to summary judgment as a matter of law on its claims for a declaratory judgment (Count IV) and alter ego (Count V) against the defendants.

**B.     DMC Was A Party to Purchase Order 1101 And Is Therefore Liable For Payment Of The Judgment Debt.**

**1.     DMC Was A Party To The Agreement Created By Purchase Order 1101.**

This Court has already concluded that Purchase Order 1101 created an enforceable contract obligation with respect to the Product manufactured by Cappseals. Memorandum, p. 5. ("The purchase order…created ITV's obligation to pay for the specific goods purchased and accepted."). Both DMC and ITV issued identical purchase orders to Healthy Solutions requesting the Product. DMC received the benefits of Purchase Order 1101 and Healthy Solutions was not paid for its performance despite invoices directed to DMC and DMC's acknowledgement within its books and records that it owed the amounts sought by the associated invoices.[20] DMC as a party to Purchase Order 1101 is liable for its failure to pay for the goods manufactured, delivered and accepted under Purchase Order 1101.

One needs to look no further than this Court's Memorandum to recognize the well settled rule that under Massachusetts law, a purchase order is considered to be an enforceable contract for goods sold. Memorandum, p. 5. ("The purchase order…created ITV's obligation to pay for the specific goods purchased and accepted."); citing *Travenol Laboratories, Inc. v. Zotal, Ltd*, 394

---

[20] The Court in the FTC action found that "*it is undisputed that the bulk of the sales revenue went to DMC, ITV, and Barrett.*" See Preliminary Injunction Order dated June 23, 2004, ¶ 12 (emphasis added). (Silverman Aff., **Ex. G**).

Mass. 95, 474 N.E.2d 1070 1073 (1985); *C.R. Bard, Inc. v. Medical Electronics Corp.*, 529 F. Supp. 1382 (D. Mass. 1982); *Carlisle Corp. v. Uresco Const. Materials, Inc.*, 823 F. Supp. 271, 274 (M.D. Pa. 1993); See also G.L. ch. 106, § 2-201. Moreover, a parties conduct subsequent to the execution of a purchase order is also dispositive of whether a contract existed between the parties. G.L. ch. 106, § 2-204.[21]

There is no dispute that DMC issued Purchase Order 1101; it faxed and mailed the Purchase Order to Healthy Solutions. In addition, there is no dispute that Healthy Solutions, in response to its receipt of Purchase Order 1101, procured from Cappseals the goods which DMC and ITV ordered on Purchase Order 1101. After shipping the goods, Healthy Solutions issued invoices addressed to **both** DMC and ITV. Finally, there is no dispute with respect to DMC's or ITV's failure to pay for the goods. Under these circumstances, DMC is the co-obligor or promisor equally responsible for the debt created by Purchase Order 1101. The Restatement (Second) of contracts addresses this common sense conclusion:

§289 Joint, Several, and Joint and Several Promisors of the Same Performance:

(1) Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof, whether his duty is joint, several, or joint and several.

Restatement (Second) of Contracts c. 13, §289 (1979).[22]

In short, the parties acted at all times relevant to the formation and performance of Purchase Order 1101 as though DMC was a co-party to the contract for goods. DMC cannot seriously dispute this fact. Thus, under Massachusetts law, DMC as a party to Purchase Order 1101 is liable

---

[21] Under Massachusetts' version of the Uniform Commercial Code, G.L. ch. 106, § 2-204, "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

[22] See *Masso v. United Parcel Service of America, Inc.*, 884 F. Supp. 610, 618 (D. Mass. 1995)(Massachusetts follows the Restatement when dealing with contract interpretation); See also *Acari v. Marder*, 225 B.R. 253, 256 (D. Mass. 1998).

for the unpaid invoices and a judgment should issue memorializing DMC's debt obligation to Cappseals.

### 2. DMC Treated The Product Shipped Under The Purchase Order As Its Own Goods.

A "person's actions subsequent to executing a legal document which tend to show his understanding of the document's legal effect may be considered in determining his intention at the time of execution." *Bourgeois v. Hurley*, 8 Mass. App. Ct. 213 (1979). *See Mass. Municipal Wholesale Electric Co. v. Danvers*, 411 Mass. 39, 59 (1991) (conduct after signing agreement is indicative of parties' intent). The particular construction given to a contract by the parties, as evidenced by their conduct, is "of great weight and will usually be adopted by the court." *C.K. Smith & Co. v. Charest*, 348 Mass. 314 (1965), *quoting Canadian Club Beverage Co. v. Canadian Club Corp.*, 268 Mass. 561, 569 (1929); *Eldridge v. Provident Cos.*, 2001 Mass. Super. LEXIS 82 (Mass. Super. Ct., March 13, 2001, Filed)(subsequent conduct is entitled to great weight when determining the parties' intentions).

Even more damning to DMC than Purchase Order 1101 and Invoices is that DMC's ***own accounting records*** show that it realized the revenue associated with the resale of the Product and recognized the costs associated with the Product. The Product made only one trip to Beverly, Massachusetts; there were no intermediate stops. Despite DMC's arguments in opposition: (1) DMC issued Purchase Order 1101, (2) DMC received the goods, (3) DMC immediately resold the goods, (4) DMC recognized the revenue for the goods, and, most important, (5) ***DMC recognized the costs/debt associated with its purchase of the goods.*** All of its actions subsequent to the issuance of Purchase Order 1011 show that DMC considered itself a party to, and a direct beneficiary of, Purchase Order 1011. Even in the light most favorable to DMC, the only logical conclusion one can draw in the face of these overwhelming and undisputed facts is that DMC was

- 12 -

also a party to Purchase Order 1101 and recognized on its own records that it was indebted to

Healthy Solutions for the cost of the goods.

Thus, because DMC was an express party to the Purchase Order it is liable to Cappseals' for

the Judgment under the reach and apply theory endorsed by the Court in its Memorandum.[23]

**C.    DMC Is Liable For ITV's Debt Because It Is ITV's Alter Ego.**

Any distinction between DMC and ITV is a pure fiction as admitted by their common

shareholders. The record bears out that these entities operate indistinguishably from one another.

Because the undisputed facts demonstrate only legal artifice separates DMC from ITV, summary

judgment is warranted allowing Cappseals to disregard their corporate distinction.

In *My Bread v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968), the seminal case on the

alter ego doctrine, the SJC enunciated the following principles:

> Although common ownership of the stock of two or more
> corporations together with common management, standing alone, will
> not give rise to liability on the part of one corporation for the acts of
> another corporation or its employees, additional facts may be such as
> to permit the conclusion that an agency or similar relationship exists
> between the entities. **Particularly is this true** (a) when there is active
> and direct participation by the representatives of one corporation,
> apparently exercising some form of pervasive control, in the activities
> of another and there is some fraudulent or injurious consequence of
> the intercorporate relationship, or **(b) when there is a confused
> intermingling of activity of two or more corporations engaged in a
> common enterprise with substantial disregard of the separate
> nature of the corporate entities,** or serious ambiguity about the
> manner and capacity in which the various corporations and their
> respective representatives are acting. **In such circumstances, in
> imposing liability upon one or more of a group of "closely
> identified" corporations, a court "need not consider with nicety
> which of them" ought to be held liable for the act of one
> corporation "for which the plaintiff deserves payment."** (emphasis
> added)

---

[23] Memorandum, p. 3 (Silverman Affidavit, **Exhibit A**). (The court stated "the existence of both debts, established beyond dispute, would entitle Cappseals to summary judgment on its statutory reach-and-apply claim.")

With respect to the second prong of the *My Bread* analysis, where a party is injured as a result of confusion associated with the intracorprate relationship, liability against a related entity may be appropriate.  See *Birbara v. Locke*, 99 F.3d 1233, 1240 (1st Cir.1996), quoting *Evans v. Multicon Contr. Corp.*, 30 Mass. App. Ct. 728 (1991)("There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing.")

In *My Bread*, the Court found certain facts dispositive to the alter ego analysis.  For instance, "all the defendant corporations … were under the full stock control of the [the same persons] and were operated as a closely coordinated single enterprise" for the distribution of milk.  *My Bread*, 353 Mass. at 620.   In addition, "all the corporations were operated ambiguously from the same headquarters." *Id.*; see also *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14 (1st Cir. 1985)(alter egos shared same business address).  In *My Bread*, the controlling person of the related entities "failed to dispel ambiguities" with respect to any putative separation between related entities.  *My Bread* at 621.[24]

Subsequent to the *My Bread* decision, the SJC has endorsed the use of twelve factors enunciated by the First Circuit in *Pepsi-Cola* to assist in the analysis used to determine whether or not to pierce the corporate veil. See *Attorney General v. M.C.K., Inc.*, 432 Mass. 546, 554-57, n19 (2000); see also *Birbara v. Locke*, 99 F.3d 1233 (1st Cir.1996)("*My Bread* sets the standard for deciding when to pierce the corporate veil; *Pepsi-Cola* elucidates some factors that may be considered when engaging in a *My Bread* analysis.").   The *Pepsi-Cola* factors include:

       (1) common ownership;
       (2) pervasive control;
       (3) confused intermingling of business assets;

---

[24] In *Pepsi-Cola*, the Court found dispositive the facts that the related corporate entities shared the same business address, they shared the same telephone listings, and they intermingled corporate assets. *Pepsi-Cola*, 754 F.2d at 14-15.

(4) thin capitalization;
(5) nonobservance of corporate formalities;
(6) absence of corporate records;
(7) no payment of dividends;
(8) insolvency at the time of the litigated transaction;
(9) siphoning away of corporation's funds by dominant shareholder;
(10) nonfunctioning of officers and directors;
(11) use of the corporation for transactions of the dominant shareholders; and
(12) use of the corporation in promoting fraud.

See *Pepsi-Cola Metro. Bottling Co.,* 754 F.2d at 14-16.  "The exercise is, of course, not one in counting.  One examines the twelve factors to form an opinion whether the over-all structure and operation misleads."  *Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 736 (1991).

Similar to the situation in *My Bread*, both DMC and ITV are managed and controlled by their only stockholders Donald Barrett and Robert Maihos.  Both companies are operated for the common purpose of promoting the sale of nutritional supplements.  As in *My Bread* and *Pepsi-Cola*, both DMC and ITV operate from the same building in Beverly, Massachusetts.  DMC and ITV share employees.  DMC's version of Purchase Order 1101 and ITV's version of Purchase Order 1101 both contain the same telephone and fax numbers for DMC and ITV.  The two purchase orders from ITV and DMC both list the same address for ITV and DMC.  Both ITV and DMC issued the same purchase order to Healthy Solutions without ever dispelling any potential ambiguity created by the issuance of two separate but identical purchase orders issued from two "separate" companies for the delivery of the same goods.  Finally, the controllers of ITV and DMC have failed to "observe with care" a proper segregation of their business records and finances.  See *My Bread*, 353 Mass. at 619.

In response to its receipt of Purchase Order 1101 issued by both DMC and ITV, ***and believing that both DMC and ITV were liable for payment on the subsequent invoices***, Healthy Solutions procured the goods.  *Compare, Evans*, 30 Mass. App. Ct. at 737 (comparing prior case and stating "the picture with Beneficial was confusing and third parties thought of themselves as

- 15 -

dealing with Beneficial").  Healthy Solutions then arranged for the goods to be delivered to Beverly, Massachusetts where both DMC and ITV list their offices.  Healthy Solutions immediately issued invoices to both DMC and ITV expecting payment on those invoices.  The invoices were addressed to both DMC and ITV at the same address.  Finally, DMC's internal accounting records identify the Invoices and indicate that DMC paid separate invoices for prior shipments of the Product from Healthy Solutions.[25]

*My Bread* stands for the general proposition that a court may disregard corporate separateness when the facts indicate that related companies are one.  The facts in this case are unequivocal with respect to whether the two companies are the same.   Donald Barrett's has confirmed the common control over ITV and DMC; the common ownership; his confusion over the precise distinction between the two entities and their employees; and, he has admitted that the formation of ITV was for no other reason other than his personal preference to make use of the word "TV" a company name.  Essentially, the President and founder of both companies admitted that there is no distinction (beyond their names) between DMC and ITV.  Moreover, their business custom bears out the fact that they were one in the same company.  Specifically, they both issued Purchase Order 1101, and, as a direct result of DMC's **and** ITV's issuance of Purchase Order 1101, Healthy Solutions ordered goods for shipment to Beverly, Massachusetts, where, at the time, both DMC and ITV listed their offices.

As for the "twelve factors" identified in *Pepsi-Cola*, the facts again are overwhelming:

**1.      Common Ownership.**

There is no doubt that DMC and ITV are owned by common principals, Donald Barrett and Robert Maihos.  Mr. Barrett admitted these facts during his deposition.

---

[25] See Silverman Affidavit, **Exhibit F, tab 6,** and, Silverman Affidavit **Exhibit G.**

### 2.    Pervasive Control.

As evidenced by the same testimony, Donald Barrett and Robert Maihos exert pervasive control over DMC and ITV in their roles as the managing officers and sole shareholders of the company. Even routine invoices for the goods ordered in this case were sent to the attention of Robert Maihos as a representative of both entities, not to an accounts payable department. Only these same principals had the authority to immediately stop, after the Judgment was issued, all transactions in the ITV bank account and shift them somewhere else. Moreover, the Court in the FTC Action found that "Barrett…directs controls, formulates, or participates in the acts of both entities."[26] Like the alter ego companies in *Pepsi-Cola*, DMC and ITV have been run as a single enterprise by Donald Barrett and Robert Maihos.

### 3.    Confused Intermingling Of Business Assets.

The record shows that DMC's and ITV's assets, especially its cash, were freely transferred between DMC and ITV. Ad hoc payments were made to DMC, Direct Fulfillment, Robert Maihos and Donald Barrett. In the related FTC Action, the Court found that Barrett and Maihos have dissipated assets by requesting that third parties "send hundred of thousands of dollars directly to Barrett instead of to DMC."[27] In addition, a third party stated that he sent "hundreds of thousands of dollars to a separate company controlled by Barrett rather than DMC."[28] Now, ITV, because of these intra company transfers, has been left as a shell of a company with a negative capitalization and with assets insufficient to satisfy the Judgment.

### 4.    Non Observance Of Corporate Formalities.

The simple fact that both ITV and DMC sent Purchase Order 1101 to Healthy Solutions demonstrates the defendants' failure to properly observe corporate formalities. DMC and ITV did

---

[26] Preliminary Injunction Order dated June 23, 2004, ¶ 2 (Silverman Affidavit, **Exhibit O**).
[27] Injunction Order, ¶13.
[28] Id.

not make two orders for two shipments on different purchase orders; instead two "different" companies issued the same purchase order.  Nevertheless, neither DMC nor ITV ever disputed the redundant issuance of Purchase Order 1101 or Healthy Solutions' issuance of the ensuing invoices to both parties.

### 5.    Siphoning Away Of ITV's Funds By Dominant Shareholder.

ITV's May, June, July and August bank records are key on this factor.  After the summary judgment decision and the Judgment were issued in the Related Action, ITV's business activities ceased for all practical purposes.  The timing and magnitude of ITV's cessation of transactions in its bank account immediately after the Judgment was issued can only be characterized as purposefully meant to defy this Court's Judgment.  Furthermore, evidence in the FTC case shows that historically "Barrett withdrew funds from certain accounts and distributed the funds to close relatives."[29]  On the whole, the evidence shows that Donald Barrett has siphoned away funds from ITV at his sole discretion.

### 6.    Use Of The Corporation In Promoting Fraud.

Finally, as the present litigation and the related litigation by the FTC shows, all of the defendants have used the corporate form to promote fraud on the consuming public by among other things, alleging the Product can cure chronic illnesses.[30] Judge O'Toole's sweeping injunction against the defendants specifically recognized their deceptive and fraudulent activities towards the public in promoting nutritional supplements that supposedly cure chronic diseases like cancer and diabetes. Aside from the falsity of these statements, the Court found that the defendants made "unauthorized charges on consumers' credit and debit cards by enrolling them in an automatic

---

[29] Injunction Order, ¶ 15, 37 ("There is evidence of on-going transfers of business assets to unknown business, Barrett, and his relatives.")
[30] Injunction Order, ¶ 24-25, 37 (Their "business operations are permeated by deceptive practices")

shipment program…- without their prior approval – when they ordered the [Product]."[31] The defendants have undisputedly used the corporate form to commit fraud on the public. In the process, they also failed to pay Cappseals which resulted in the ensuing Judgment.

Cappseals, as a successful reach and apply plaintiff, seeks payment for the goods it delivered almost two years ago to ITV. Only now, after ITV has transferred all of its assets to DMC, does ITV raise the defense of corporate separateness. Nevertheless, as the Court stated in *Evans* with regard to an alter ego analysis, "the exercise is, of course, not one in counting. One examines the twelve factors to form an opinion whether the over-all structure and operation misleads." *Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 736 (1991). Additionally, this Court "need not consider with *nicety* which of them ought to be held liable for the act of one corporation for which the plaintiff deserves payment." *My Bread* at 619 (emphasis added). As this Court indicated in its Memorandum, Cappseals certainly "deserves payment." Accordingly, relying on the principles of *My Bread*, this Court should not preserve a dubious legal distinction such that it results in a gross inequity to Cappseals and the distinction between ITV and DMC should be ignored.

### IV.    CONCLUSION

DMC and ITV jointly issued Purchase Order 1101. Healthy Solutions billed both DMC and ITV for the Product delivered in response to Purchase Order 1101. This Court has already ruled that Purchase Order 1101 created Healthy Solutions right to payment. As a co-obligor of Healthy Solutions' right to payment on Purchase Order 1101, this Court should issue a judgment declaring that DMC is liable for the debt created by Purchase Order 1101 and the resulting amounts owed to Cappseals. Alternatively, based on the overwhelming facts in the record, the Court can only conclude that DMC and ITV are alter egos. Thus, DMC is liable on the Judgment under an alter ego theory.

---

[31] Injunction Order, ¶ 9.

Respectfully Submitted
Cappseals, Inc.
By its attorneys,


/s/ Scott A. Silverman
Daniel J. Kelly, BBO # 553926
dkelly@ghlaw.com
Scott A. Silverman, BBO # 638087
ssilverman@ghlaw.com
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  02110
(617) 345-7000

November 10, 2005

B0429904v1

## CERTIFICATE OF SERVICE

I hereby certify that true and accurate copies of the foregoing *Cappseals' Memorandum Supporting its Motion for Summary Judgment* was served on the foregoing attorneys of record pursuant to Fed. R. Civ. P. 5 as follows:

Via electronic notification:

Peter S. Brooks            pbrooks@seyfarth.com

Susan W. Gelwick        sgelwick@seyfarth.com

Christopher F. Robertson        crobertson@seyfarth.com


                                                    /s/ Scott A. Silverman
                                                    Daniel J. Kelly BBO# 553926
                                                    dkelly@ghlaw.com
                                                    Scott A. Silverman, BBO #638087
                                                    ssilverman@ghlaw.com
                                                    Gadsby Hannah LLP
                                                    225 Franklin Street
                                                    Boston, MA 02110
DATED:  November 10, 2005            (617) 345-7000