**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CAPPSEALS, INC.,             ) | |
|           ) | |
|      Plaintiff,      ) | |
|           ) | |
| v.              ) | CIVIL ACTION NO. 05-CV-11907-JLT |
|           ) | |
| DIRECT MARKETING CONCEPTS, INC., et ) | |
| al.,           ) | |
|           ) | |
|      Defendants.      ) | |

## AFFIDAVIT OF DONALD BARRETT

I Donald Barrett, under oath declare as follows:

1.      I am one of the shareholders of Direct Marketing Concepts, Inc. ("DMC") and ITV Direct, Inc. ("ITV").  Both DMC and ITV are Massachusetts corporations, although DMC was formed as an S-Corporation and ITV was formed as a C-Corporation.  I make this affidavit on the basis of my own personal knowledge of the facts set forth herein.

2.      DMC and ITV are separate business entities with separate business purposes. DMC was formed for the purpose of searching out products and people that it believes will work well together in an infomercial, and providing the administrative services in connection with selling such products via infomercials.  Initially, DMC did not have the capacity to purchase media or produce infomercials, and had secured the services of an outside company in Pennsylvania for this purpose.  ITV was then established for the purpose of purchasing the media and producing the infomercials for future products located by DMC.

3.      In April of 2003, ITV entered into a contract with Healthy Solutions, LLC ("Healthy Solutions") for the rights to air an infomercial promoting a product known as Supreme Greens ("Supreme Greens" or "the Product") and to become a distributor of the Product (the

"Distribution Agreement"). A true and correct copy of the Distribution Agreement is attached hereto as Exhibit A. DMC was not a party to the Distribution Agreement and DMC never had any contract with Healthy Solutions.

4.    In connection with the promotion of Supreme Greens, ITV purchased millions of dollars of media. The funds for the purchase of this media were provided from several sources, including advances from DMC. DMC also provided administrative services to ITV, including telephone answering services, credit card processing services and customer service.

5.    The business plan and forecast for ITV anticipated that ITV would repay all amounts owed to DMC during the course of running the infomercial program, likely after six to eight months. Given the extraordinary up-front expense of running a major advertising promotion, it is quite typical that companies will run at a significant loss early in the history of the program, with the expectation that future sales will result in a profit. However, the airing of the Supreme Greens advertising was unexpectedly cut short by the intervention of the Federal Trade Commission and the Food and Drug Administration investigations, and the Supreme Greens show never recouped these extraordinary up front costs.

6.    As set forth in the Distribution Agreement between ITV and Healthy Solutions, ITV ordered and received the Supreme Greens product from Healthy Solutions. Any purchase orders that were issued by DMC were issued by mistake, as ITV was the only company that had a contract with Healthy Solutions to purchase Supreme Greens. Confirming Healthy Solutions' understanding of its contractual relationship with ITV, at no time did Healthy Solutions ever take action against DMC to seek payment for the Supreme Greens product, and Healthy Solutions never sued DMC in the related case for payment for the Product.

7.      In addition, Cappseals never sued DMC in the related case for payment for the Product.  Following Cappseals' lead, Healthy Solutions only brought claims against ITV and Direct Fulfillment, LLC for payment for the Product.  Direct Fulfillment was a company that was established to fulfill customer orders and ship the Product.

8.      ITV Direct, Direct Fulfillment and their affiliates entered into a settlement agreement with Healthy Solutions and its affiliates of all claims that these parties raised against each other, including the claims that were raised in the actions pending in the U.S. District Court for the District of Massachusetts entitled *FTC v. Direct Marketing Concepts, Inc*. and *ITV Direct, Inc. v. Healthy Solutions, Inc., et al.*  On September 9, 2005, the parties also executed and exchanged mutual releases, which released all claims that the Healthy Solutions parties had against ITV and its affiliates, including DMC.  A true and correct copy of the Settlement and Mutual Release dated September 9, 2005 is attached hereto as Exhibit B.

Executed this 2nd day of December, 2005 in Los Angeles, California.

/s/ Donald Barrett
Donald Barrett

BO1 15750359.1

## DISTRIBUTION AGREEMENT

This Exclusive Distribution Agreement and License ("Agreement") made and effective this 4 day of April 2003, by and between ITV Direct, Inc., a Massachusetts Corporation with a principal place of business at 100 Cummings Center Drive, Suite 506E, Beverly, Ma. 01915 ("Distributor") and Healthy Solutions, LLC, a California Limited Liability Corporation with a principal place of business at 11272 Daylilly St. Fontana, CA. 92337 ("Manufacturer"). Collectively, Distributor and Manufacturer are sometimes hereinafter referred to as the "Parties".

## WITNESSETH:

1. Manufacturer desires to appoint Distributor, and Distributor desires to accept appointment, as a marketer, distributor and licensee of Manufacturer's product as defined and set forth herein, with exclusive world-wide rights for direct-response telemarketing generated by infomercials.

2. Manufacturer produces and sells a vegetable/grass/algae food supplement known as "Supreme Greens with MSM", (the "Product") as formulated, packaged and described on **Exhibit A.** (the "Container") attached hereto and incorporated by reference.

3. Distributor intends to market and sell the product through various means, including direct-response telemarketing generated by infomercials, print, radio and other advertising media and to various markets, including wholesale and retail customers.

**NOW, THEREFORE,** in consideration of the mutual agreements and promises set forth herein and other good and valuable consideration, the Parties agree as follows:

1. Definitions:

For purposes of this Agreement, the following definitions shall apply:

**"Product"** shall mean only the product listed or defined on **Exhibit "A"** attached hereto and incorporated herein. Notwithstanding the foregoing, during the term of this Agreement, Manufacturer may, but is not obligated to, offer new or additional products not listed herein to Distributor on terms no less favorable than offered to other distributors of Manufacturer, provided that it is understood and agreed that any such new or additional products may only be incorporated into this Agreement by separate negotiation and written amendment between Distributor and Manufacturer.

**"Customer"** shall mean the purchasers from Distributor of any Products purchased by Distributor hereunder.

**"Distributor"** refers to ITV Direct, Inc. and any affiliated entity of Distributor that sells or otherwise distributes the Product.

**"Territory"** is "Worldwide"

2.  <u>Distributorship Appointment</u>:

Subject to the terms and conditions set forth herein, Manufacturer hereby appoints Distributor, and Distributor hereby accepts such appointment, as Manufacturer's distributor and licensee for the Product in the Territory during the term of this Agreement. Manufacturer will not appoint or license any other distributor to market the Product by means of direct-response telemarketing based on infomercials, and will itself not engage in direct-response telemarketing of the Product based on infomercials. The parties understand and agree that Manufacturer intends to, and will, market, sell and otherwise distribute the Product by means other than direct-response telemarketing generated by infomercials.

3.  <u>Distributor's Right to Market Products Using Its Own Name.</u>

Any Product or unit of Products purchased from Manufacturer under this Agreement may be marketed by Distributor with its trademark and/or trade name in addition to Manufacturer's trademark and/or trade name. Notwithstanding the foregoing, in all Distributor infomercials, promotions, advertisements and other literature of what ever name and/or nature, such Product and units thereof may be referred to by Distributor as "Distributor Product".

4.  <u>Distributor Rights to sell to Dealers and Retail Purchasers.</u>

The rights hereunder granted to Distributor shall specifically include the right to sell to any other person or entity without restriction or limitation.

5.  <u>Competing Products.</u>

Without Distributor's prior written consent, Manufacturer shall not directly or indirectly sell or otherwise distribute any vegetable/grass/algae based products which compete with the Product by means of direct-response telemarketing based on infomercials, nor shall Manufacturer license or otherwise permit others to do so.

6.  <u>Referrals.</u>

Manufacturer will refer to Distributor for direct action any orders or inquiries for Product from Customers.

2

7. Import Licenses and Fees.

Manufacturer will ensure that all necessary import licenses and permits are obtained, that all customs duties and other charges and fees are paid and that all other actions required to accomplish the import of the raw materials used in the fabrication and production of the Product purchased from it by Distributor are taken.

8. Compliance with Laws.

Manufacturer will comply with all applicable laws and regulations in importing and producing the Product and will not violate any laws or regulations applicable to Manufacturer or the Product including regulations promulgated by the applicable U.S. Customs Authority and/or the Department of Commerce.

9. Expenses.

Distributor shall be responsible for all expenses incurred by it in connection with the implementation and performance of its duties and obligations under this Agreement, including but not limited to, advertising and promotion expenses; and any and all sales and other taxes, or charges which may be imposed on Distributor in connection with its business.

10. Term:

This Agreement commences on the date on which this Agreement is duly executed by the Parties hereto and ending twelve months therefrom ("Initial Term"). This Agreement will thereafter automatically renew from year to year unless otherwise terminated as provided herein.

11. Rights Granted:

Manufacturer hereby grants to Distributor rights, on the terms and conditions contained herein, to purchase, inventory, promote and resell the Product (as defined below) in any market, state or country by the use of infomercial, print, radio or any other media. The selection, frequency, target market and selection of media outlets are the sole discretion of Distributor. The parties understand and agree that Manufacturer intends to, and will, market, sell and otherwise distribute the Product by means other than direct-response telemarketing generated by infomercials.

12. Terms of Sale:

(a) All sales of Product to Distributor shall be made at the price of six dollars and fifty cents ($6.50) per Container, payable in US funds. Such price includes all royalties to any person or entity under this Agreement or any agreement(s) relating to the Product, or any other person or entity

3

and includes all other costs except those specifically defined in this Agreement.

(b) Distributor shall be responsible for the cost of shipping all orders under 10,000 units, and Manufacturer shall be responsible for the cost of shipping all orders in excess of 10,000 units, from Manufacturer's facilities to Distributor's distribution/warehouse facilities in the United States. Notwithstanding the foregoing, for all orders, regardless of size, Distributor shall pay the premium over standard land rates for orders shipped overnight, airfreight or other expedited means. Distributor may, at its option, select the method of shipping and/or the transportation company employed for such shipping. Notwithstanding the foregoing, risk of loss shall pass to Distributor when Product arrives at Distributor's facilities.

(c) Distributor shall provide, at its sole expense, labels to be affixed to each Container of the Product as shown on **Exhibit B**, attached hereto and incorporated by reference. Manufacturer shall be responsible for affixing labels to the Product. Nevertheless, Distributor may edit, alter or change the label from time to time at its expense, with such expense to include the cost of re-labeling any Product previously labeled with an outdated label.

(d) Manufacturer agrees to properly pack all items for shipment. The Parties agree that Manufacturer will package the Product in boxes of twenty four (24) containers each. However, from time to time Distributor may direct Manufacturer to alter the packaging to accommodate Distributors needs. In such an event, Distributor shall, at its own expense, supply to Manufacturer any additional packaging materials needed to make such packaging changes.

13. Manufacturer's Responsibilities.

Manufacturer shall perform the following duties pursuant to this Agreement:

(a) Manufacturer will use its best efforts to supply Distributor's requirements for the Products on the terms and conditions of this Agreement. During the term of this Agreement, Manufacturer shall be obligated to supply Distributor with its requirements subject to paragraph 14, herein, except as it is prevented from doing so as a result of the occurrence of events beyond its reasonable control, commonly referred to as "Force Majeure".

(b) Manufacturer agrees to properly pack all items for shipment. The Parties agree that Manufacturer will package the Product in boxes of twenty-four (24) containers each. However, from time to time Distributor may direct Manufacturer to alter the packaging to accommodate Distributors needs. In such an event, Distributor shall supply to Manufacturer any additional packaging materials needed to make such packaging changes.

4

(c) Manufacturer shall advise Distributor of its estimated delivery date as soon as is reasonably practicable after receipt of the order.

Notwithstanding the foregoing or anything herein contained to the contrary, if Manufacturer ceases producing Product or substantially reduces their output to Distributor, then they shall offer to transfer, sell and assign to Distributor all of its right, title and interest in and to the Product and any related proprietary or trademark rights and/or property. The price shall be determined by mutual agreement made in good faith between the Parties. In the event that the Parties can not agree in good faith to a purchase price, then this issue shall be referred to arbitration conducted within Boston, Massachusetts, in accordance with the rules and procedures of, and with an arbitrator appointed by, the American Arbitration Association. In any case, Manufacturer shall be obligated to give Distributor six (6) month's written notice prior to ceasing to produce the Product.

14. Ordering:

During the term of this Agreement, Distributor shall issue purchase orders to Manufacturer for the Products, which purchase orders shall state: "This purchase order is placed under the terms and conditions of the Distributor Agreement between Distributor and Manufacturer, dated March __, 2003". All Distributor purchase orders shall be accepted by Manufacturer in writing within three (3) days after receipt by Manufacturer and shall be deemed accepted unless objected to in writing by Manufacturer within said three (3) day period. Distributor agrees to submit all purchase orders to Manufacturer via facsimile transmission during the hours from 9:00 a.m. to 4:00 p.m. Pacific Time, Monday through Friday

(a) Manufacturer shall timely fill all Purchase Orders. For the purposes of this Agreement, timely manner shall mean delivery to Distributor of the complete Purchase Order within twenty eight (28) calendar days from the date of a Purchase Order.

(b) Inspection and acceptance of the Products shall take place at destination. Distributor may reject the Products that fail to meet the Manufacturer's formulation, or are damaged or not packaged in accordance with the terms hereof or defective in any other manner within ten (10) days after receipt. Distributor may, at its option, return rejected Products to Manufacturer for replacement at no additional expense to Distributor and Manufacturer shall pay all freight charges incurred in returning the defective Product and redelivering it to Distributor.

(c) Distributor may delay the delivery date or reconfigure the order by delivering a written change order notice to Manufacturer, but shall be obligated to purchase the entire order once placed. Deliveries of Products may be rescheduled without charge if Distributor's change order is received by Manufacturer at least fourteen (14) days prior to the original or the rescheduled date of delivery.

(d) Distributor may cancel any order by notice to Manufacturer within 10 days of the date that the order is placed, provided that Manufacturer shall be entitled to retain the deposit placed with the order as a cancellation charge. Distributor shall have no further liability regarding the cancelled order.

15. Payment:

Distributor will pay fifty percent (50%) of a Purchase Order by wire or certified funds at the time the Purchase Order is placed. Distributor will pay the remaining balance of the Purchase Order upon written notification from Manufacturer that the order is ready for shipping. Such notification will include the packing slip, invoice for the Purchase Order and certificate of analysis. Further, Manufacturer will deliver to Distributor by over night express service a sample of the Product ready for shipment.

16. Marketing:

(a) Distributor shall have the right to name, re-name and package the Product for sale under its own brand.

(b) Distributor will produce and pay all expenses necessary to create a twenty eight (28) minute infomercial to promote and sell the Product (the "Infomercial"). Production and editing of the Infomercial will be completed within forty five (45) days of signing of this Agreement.

1. Manufacturer shall have the obligation to provide, at no cost to Distributor, an expert spokesperson that Distributor may, at its sole discretion use in the Infomercial.

2. The spokesperson will provide expert testimonials including the description of their professional credentials as they relate to the Product.

3. The spokesperson will be available upon reasonable notice by Distributor.

4. For the purposes of this Agreement, Manufacturer designates Alex Guerreo as the spokesperson.

6

(c) From time to time Distributor may modify, alter, edit or re-create the Infomercial. The Infomercial including any subsequent versions shall at all times remain the sole property of the Distributor. Manufacturer shall not acquire any ownership, rights of any kind or nature, intellectual property rights or ownership of any form in the Infomercial under this Agreement. Manufacturer acknowledges that the Infomercial at all times remain the property of Distributor.

(d) Nothing herein contained shall give Manufacturer any right title or interest to any trademarks, service marks, trade names, logos owned or used by Distributor including but not limited to E8 Daily, Today's Health or any other name currently used or used in the future by Distributor or its affiliates.

(e) Upon signing of this Agreement and from time to time, Manufacturer will provide to Distributor written testimonials, marketing reference materials and other representations and assistance about the Product that Distributor may include in its marketing activities including filming of the Infomercial. Distributor relies solely upon the Manufacturer for the accuracy and completeness of such materials and representations.

(f) Distributor is hereby granted the right to reproduce, at its expense, Manufacturer's publicly distributed documentation relating to the Product and to use such documentation in connection with the sale of the Product. Reproductions of Manufacturer trademarks, logos, symbols, etc., shall be true reproductions and shall be done photographically.

(g) During the term of this Agreement, Distributor is hereby granted permission to use Manufacturer's trademarks and trade names in connection with Distributor's sale and advertising of the Product.

(h) The Parties further understand and agree that Manufacturer may market and sell the Product on its own, independently of the provisions of this Agreement, provided, however, that Manufacturer may not use Infomercials or allow its products to be featured in any infomercial other than that of the Distributor as part of its marketing efforts.

17. Re-selling:
Distributor may resell the Product to any person or entity at any price or in any quantity deemed appropriate by Distributor. Manufacturer shall not be entitled to any payment, commission or royalty of any kind as a result of any such re-selling.

18. Insurance:
Manufacturer shall, at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to the respective activities related to the product, including but not limited to completed operations and general

public liability with the premiums thereon fully paid on or before due date, issued by and binding upon an insurance company qualified to do business in Massachusetts. Such insurance to afford minimum protection of not less than two million dollars ($2,000,000) combined single limit coverage of completed operations and product liability or combination thereof. Distributor shall be listed as an additional insured on Manufacturers policy or policies of comprehensive general liability insurance and Manufacturer shall provide Distributor with current Certificates of Insurance evidencing Manufacturers compliance with this Paragraph. Manufacturer shall obtain the agreement of Manufacturers insurers to notify Distributor that a policy is due to expire at least (10) days prior to such expiration.

19. Non-Competition:
The intent of this Agreement is for Distributor to be a world wide distributor of the Product, with exclusive rights to market, sell and distribute the Product through direct-response telemarketing based on infomercials. Manufacturer agrees that during the term of this Agreement, including any extension thereof, that Manufacturer, its officers, agents, employees or associates will not engage or assist, directly or in-directly with any other party in the marketing or sale of the Product through direct-response telemarketing based on infomercials.

Manufacturer and Distributor acknowledge and agree that each party has a legitimate business interest in protecting its proprietary information from abuse and agrees that the restrictions set forth herein are reasonably necessary to protect such legitimate business interests.

20. Representations and Warranties:

A. Manufacturer represents and warrants and covenants:

i) That it has the right to enter into and fully perform this Agreement and to do so will not violate or conflict with any material term or provision of the by-laws of the Manufacturer or any agreement, instrument, statute, rule, regulation, order or decree to which Manufacturer is a party or by which Manufacturer is bound, and this Agreement has been duly authorized by and executed on behalf of, Manufacturer, in accordance with its terms;

ii) That all actions performed by Manufacturer in furtherance of this Agreement shall comply with all applicable state, federal rules, ordinances, rules and regulations;

iii) The merchantability of the Product and its fitness for the particular purpose for which it is being purchased.

8

  iv) That the Product is produced consistent with its stated formulation and specifications.

  v) That the Product composition and/or formulation does not infringe upon any proprietary or other similar rights.

  vi) Manufacturer also agrees to extend its warranty hereunder to end users of the Product.

B. Distributor represents and warrants and covenants that:

  i) It has the right to enter into and fully perform this Agreement and to do so will not violate or conflict with any material term or provision of the by-laws of the Distributor or any agreement, instrument, statute, rule, regulation, order or decree to which Distributor is a party or by which Distributor is bound, and this Agreement has been duly authorized by and executed on behalf of, Distributor , in accordance with its terms;

  ii) All actions performed by Distributor in furtherance of this Agreement shall comply with all applicable state, federal rules, ordinances, rules and regulations; and

  iii) It will use its best efforts to market, sell and otherwise distribute the Product through various means, including, inter alia, direct-response telemarketing generated by infomercials.

21. Acts of God :

If the performance of this Agreement or any obligation hereunder, except the making of payments hereunder, is prevented, restricted or interfered with by reason of fire, flood, earthquake, explosion or other casualty or accident; strikes or labor disputes; inability to procure parts, supplies or power; war or other violence; any law, order, proclamation, regulation, ordinance, demand or requirement of any government agency; or any other act or condition whatsoever beyond the reasonable control of the affected party, the party so affected, upon giving prompt notice to the other party, shall be excused from such performance to the extent of such prevention, restriction or interference; provided, however, that the party so affected shall take all reasonable steps to avoid or remove such causes of nonperformance and shall resume performance hereunder with dispatch whenever such causes are removed.

22. Non-circumvention:

Except as otherwise authorized by this Agreement, Manufacturer shall not circumvent Distributor in the marketing, sale or distribution of the Product in any way.

23. Proprietary Information:

Manufacturer acknowledges (i) that the Telemarketing Know-How (as hereafter defined) obtained from Distributor hereunder is commercially valuable proprietary information of Distributor or others, the design and development of which has involved the expenditure of substantial amounts of money and the use of skilled development experts over a long period of time and which affords Distributor a commercial advantage over its competitors: (ii) that such Telemarketing Know-How constitutes trade secrets and confidential business information that is disclosed to Manufacturer for use on the basis of the relationship between Distributor and Manufacturer under this Agreement and is to be used only as may be expressly permitted by the terms and conditions of this Agreement; (iii) that the loss of this competitive advantage due to unauthorized disclosure of such proprietary information would cause great injury and harm. As used in the Agreement, the term "Telemarketing Know-How" means any and all information of any kind whatsoever now possessed by or known to, or hereafter developed or acquired by, Manufacturer relating to (1) the marketing, data collection and sales techniques used by Distributor, and/or marketing information of potential competitive value (e.g. customer information, promotional plans, market data, etc. developed by Distributor) (2) the techniques and methods used by Distributor for fulfilling Product Orders , (3) specific techniques, scripting and methods developed by and used within the call center of Distributor and (4) any techniques and methods developed and implemented by Distributor for selecting media markets or demographic data used in selecting media outlet to run or air the Infomercial.

24. Indemnification:

Manufacturer agrees upon demand to defend, indemnify and hold harmless Distributor, its officers, directors, employees, shareholders and affiliates from any and all claims, lawsuits, actions and proceedings in any court or by any governmental unit arising out of or relating to the Product as manufactured, its contents or impact on the health of any person.

Distributor agrees upon demand to defend, indemnify and hold harmless Manufacturer, its officers, directors, employees, shareholders and affiliates from any and all claims, lawsuits, actions and proceedings in any court or by any governmental unit arising out of or relating to Distributor's market, sales and distribution efforts pertaining to the Product and/or any post-delivery alteration or modification to the Product, including physical damage after Distributor has accepted delivery.

25. <u>Relationship</u>:

Each Party will act as an independent contractor under the terms of this Agreement and not as an agent or other legal representative of the other Party for any purpose, and neither Party has any right or authority to assume or create any obligation of any kind, express or implied, on behalf of the other Party to any other person.

26. <u>Termination</u>:

This Agreement shall terminate upon any of the following events:

> A. Any bankruptcy, receivership, insolvency, dissolution of the other party.
>
> B. Any assignment by the other party for the benefit of creditors.
>
> C. Any breach of any provision of this Agreement, or any other agreement between the Parties that remains un-cured for a period of thirty (30) days after written notice provided in accordance with Paragraph 16 below.

27. <u>Notice</u>:

Notice shall be deemed given if sent by U.S. Mail, certified, return receipt requested to:

**Manufacturer:**
Healthy Solutions, LLC
11272 Daylilly St.
Fontana, CA. 92337

**Distributor:**
ITV Direct
100 Cummings Center Drive
Suite #506E
Beverly, Ma. 01915

28. <u>Acknowledgement</u>:

Each party acknowledges that no representation or statement, and no understanding or agreement, has been made, or exists, and that in entering into this Agreement each party has not relied on anything done or said or on any presumption in fact or in law, (1) with respect to this Agreement, or to the duration, termination or renewal of this Agreement, or with respect to the relationship between the parties, other than as expressly set forth in this Agreement; or (2) that in any way tends to change or modify the terms, or any of them, of this Agreement or to prevent this Agreement becoming effective; or (3) that in any way affects or relates to the subject matter hereof. Manufacturer and Distributor also acknowledge that the terms and conditions of this Agreement, and each of them, are reasonable and fair and equitable.

11

(a) Manufacturer and Distributor acknowledges and agrees that each party has a legitimate business interest in protecting its proprietary information from abuse and agrees that the restrictions set forth herein are reasonably necessary to protect such legitimate business interests.

29. Integration and Modification:
This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

30. Assignment:
The rights duties and obligations of Distributor arising under this Agreement may not be assigned without consent of Manufacturer.

31. Confidentiality:
The Parties agree that, except as expressly provided in this Paragraph 31, the terms and conditions of this Agreement shall remain confidential and shall not be disclosed to any third party. The Parties may disclose the terms and conditions of this Agreement to their respective employees, attorneys, accountants and tax return preparers on a need to know basis.

32. No Implied Waivers:
Except as expressly provided in this Agreement, waiver by either party, or failure by either party to claim a default, of any provision of this Agreement shall not be a waiver of any default or subsequent default.

33. Governing Law:
This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

34. Severability:
If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

35. Headings.
Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

36. Counter Parts:
This Agreement may be executed in counter parts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

Healthy Solutions                    ITV Direct, Inc.
By its President                     By its President


By: _____                By: _____
Michael Howell                       Donald Barrett
President                            President

13

SETTLEMENT AND MUTUAL RELEASE

This Settlement and Mutual Release (the "Settlement Agreement") is dated this ___ day of September, 2005 and is by and among Healthy Solutions, LLC, Health Solutions, Inc., Alejandro Guerrero, Michael Howell, Gregory Geremesz (collectively the "Healthy Solutions Parties"), ITV Direct, Inc. and Direct Fulfillment, LLC (collectively the "ITV Direct Parties").

WHEREFORE, the Healthy Solutions Parties and the ITV Direct Parties have asserted certain claims against each other in two litigations pending in the United States District Court for the District of Massachusetts, captioned *FTC v. Direct Marketing Concepts, Inc.* ., U.S. Dist. Ct. D. Mass. Civil Action No. 04-CV-11136-GAO, and *ITV Direct, Inc. v. Healthy Solutions LLC,* U.S. Dist. Ct. D. Mass. Civil Action No. 04-CV-10421-JLT, and one appeal pending before the United States Circuit Court of Appeals for the First Circuit (the "Lawsuits"); and

WHEREFORE, the parties have determined that it is in their mutual best interest to resolve these claims in their entirety and to provide comprehensive releases of any further claims;

IT IS HEREBY STIPULATED AND AGREED, as follows:

1.      The ITV Direct Parties hereby release and forever discharge the Healthy Solutions Parties and all of their respective affiliates, officers, directors, employees, predecessors, successors, servants, attorneys, agents, representatives and assigns of and from any and all debts, demands, actions, causes of action, contracts, claims, suits, judgments, damages and liabilities of any kind or nature whatsoever, in law or in equity, whether known or unknown, anticipated or unanticipated, and whether accrued or hereafter to accrue, which the ITV Parties raised or could have raised in connection with, arising from, or related to the Lawsuits.

2.      The Healthy Solutions Parties hereby release and forever discharge the ITV Direct Parties and all of their respective affiliates, officers, directors, employees, predecessors, successors, servants, attorneys, agents, representatives and assigns of and from any and all debts, demands, actions, causes of action, contracts, claims, suits, judgments, damages and liabilities of any kind or nature whatsoever, in law or in equity, whether known or unknown, anticipated or unanticipated, and whether accrued or hereafter to accrue, which the Healthy Solutions Parties raised or could have raised in connection with, arising from, or related to the Lawsuits.

3.      Each of the parties hereby expressly waives and relinquishes, to the fullest extent permitted by law, the provisions, rights and benefits of § 1542 of the California Civil Code, or its equivalent in any other jurisdiction, which provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

All parties acknowledge that the foregoing waiver was bargained for and a key element of this Settlement Agreement of which the general release is a part. Each party agrees that this

Agreement is intended to cover all claims or possible claims arising out of or related to those matters referenced or impliedly covered in the general release referenced above, whether the same are known, unknown or hereafter discovered or ascertained, and the provisions of §1542 of the California Civil Code, or its equivalent in any other jurisdiction, are hereby expressly waived. The parties hereto expressly acknowledge that they have been advised by their respective counsel of the contents and effect of such provisions, and with such knowledge they hereby expressly waive whatever benefits they may have pursuant to such provisions.

4.      Upon execution of this agreement, the parties agree to execute the attached Stipulations of Dismissal in *FTC v. Direct Marketing Concepts, Inc.*, and *ITV Direct, Inc. v. Healthy Solutions LLC*, and all appeals therefrom, and file same with the respective Courts.

5.      Each of the parties to this Settlement Agreement represents and warrants unto the other parties hereto that:

      A.      It or he has the legal capacity and authority to compromise and release all claims provided here; except to the extent that FTC consent, court approval or the consent of Cappseals, Inc. is required, and the parties hereto shall make reasonable effort to obtain such consents or seek Court approval;

      B.      It or he has the legal capacity and authority to enter into and perform the terms of this Agreement, which Settlement Agreement constitutes its or his voluntary, legal, valid and binding obligations; and

      C.      It or he has read this Settlement Agreement, understands the same, and intends to be legally bound by it.

The foregoing representations shall survive the closing of this Settlement Agreement.

6.      This Settlement Agreement constitutes the entire agreement between and among the parties and supersedes all prior agreements, representations, warranties, statements, promises, and understandings, whether oral or written with respect to the subject matter hereof. None of the parties shall be bound by or charged with any oral or written agreements, representations, warranties, statements, promises or understandings with respect to the subject matter hereof, not specifically set forth or referred to in this Settlement Agreement.

7.      This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument.


[Remainder of this page intentionally blank]

Witness our hands and seals this __9__ day of September, 2005

_____
Alejandro Guerrero

Healthy Solutions, LLC

By: _____

Title: _____CEO_____

_____
Michael Howell

Gregory Geremesz

Health Solutions, Inc.

By: _____

Title: _____

ITV Direct, Inc.

By: _____

Title: _____

Direct Fulfillment, LLC

By: _____

Title: _____

Witness our hands and seals this __9__ day of September, 2005

Alejandro Guerrero

Healthy Solutions, LLC

By:_____

Title:_____

_____
Michael Howell

_____
Gregory Geremesz

Health Solutions, Inc.

By:_____

Title:___CEO_____

ITV Direct, Inc.

By:_____

Title:_____

Direct Fulfillment, LLC

By:_____

Title:_____

Witness our hands and seals this ___9___ day of September, 2005

_____
Alejandro Guerrero

_____
Michael Howell

_____
Gregory Geremesz

ITV Direct, Inc.

By:_____

Title:_____

Direct Fulfillment, LLC

By:_____

Title:_____

Healthy Solutions, LLC

By: _____

Title: _____

Health Solutions, Inc.

By:_____

Title:_____

Witness our hands and seals this 2nd day of September, 2005

_____
Alejandro Guerrero

Healthy Solutions, LLC

By:_____

Title: _____

_____
Michael Howell

Health Solutions, Inc.

_____
Gregory Geremesz

By:_____

Title:_____

ITV Direct, Inc.

By: _____

Title: _Vice President_

Direct Fulfillment, LLC

By: _____

Title: _attorney_