UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAPPSEALS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DIRECT MARKETING CONCEPTS, INC., ) <br> ITV DIRECT, INC., DIRECT ) <br> FULFILLMENT, LLC, DONALD ) <br> BARRETT, and ROBERT MAIHOS, ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> ) | CIVIL ACTION NO. 05-11907-JLT |

**CAPPSEALS, INC.'S REPLY MEMORANDUM TO DMC'S OPPOSITION TO
CAPPSEALS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Cappseals, Inc. ("Cappseals") respectfully submits this Reply to Direct Marketing

Concepts, Inc.'s ("DMC") Opposition to Cappseals' Motion for Partial Summary Judgment

("Opposition") in order to: (1) expose DMC's **earlier representation to this Court** concerning

the effect of its release of Healthy Solutions now contradicted in its Opposition; (2) address

DMC's argument that the merger doctrine should bar Cappseals' claims; (3) address DMC's

attempt to resist summary judgment based on: (i) unsupported statements cloaked as facts; (ii)

the introduction of sham affidavits that contradict the affiants' prior sworn deposition testimony;

and (4) further demonstrate that DMC and ITV are alter egos run as a common enterprise.

DMC asserts a number of putative defenses to resist Cappseals' request for partial

summary judgment on its co-obligor and alter ego claim. Nevertheless, this Court should not

apply the doctrine of merger nor enforce ITV's release of Healthy Solutions so as to allow DMC to prevent Cappseals' from collecting on the Judgment[1] issued by this Court.

In addition, the statements contained in DMC's supporting affidavits either contradict prior deposition testimony or are belied by DMC's own financial records, and these statements should therefore be disregarded or stricken altogether. Accordingly, DMC creates no genuine dispute of material fact that would allow it to resist summary judgment.

To the contrary, it is unequivocal that DMC and ITV are alter egos run as a common enterprise. Although legally separate, the two entities share the same address, shareholders, control persons and accountants. Their accounting systems and financial apparatus are controlled by the same persons. ITV has no employees and virtually no assets to speak of. ITV's only revenue is comprised of cash transfers from DMC which ceased after the Judgment was issued. ITV's sole purpose is to remit payment to media outlets for media buys made on DMC's behalf. These facts remain undisputed and more than satisfy the alter ego legal standards set forth in *My Bread v. Cumberland Farms, Inc.*, 353 Mass. 614 (1968) and *Pepsi-Cola Metro. Bottling Co.*, 754 F.2d at 14 (1st Cir. 1985).

For the reasons set forth in Cappseals' Motion for Partial Summary Judgment and this Reply, Cappseals' Motion should be ALLOWED.

I.     **THIS COURT SHOULD REFUSE TO ENFORCE THE RELEASE AND VACATE THE DISMISSAL.**

On September 13, 2005, DMC and Healthy Solutions filed a joint Stipulation of Dismissal[2] which dismissed all of the parties' respective claims (the "Stipulation") pursuant to a release and settlement agreement the parties executed on September 9, 2005 (the "Release").

---

[1] Judgment in Favor of Cappseals in *ITV Direct, Inc. v. Healthy Solutions, LLC et al.*, CA No. 04-10421-JLT (the "Related Action") (Dkt. No. 140) and attached hereto as **Exhibit A** to Antonelli Affidavit.
[2] The Stipulation was filed and entered in the Related Action. (Dkt. Nos. 153, 157).

Because Healthy Solutions was subject to this Court's order permanently enjoining it from transferring any assets including any claims[3], the parties' sought this Court's approval of the Stipulation and Release.[4]  As grounds for its request for the Court's approval, counsel for the parties represented to this Court that:

> *this compromise, release and settlement in no way effects the rights of any other party* (emphasis added).

Stipulation, ¶ 4.  Notwithstanding this unambiguous representation, DMC now asserts to this Court, in its Opposition, that the Stipulation and Release bar Cappseals' rights in this summary judgment proceeding.  Significantly, DMC now asserts that:

> Since the … claims asserted by Cappseals are derivative of the claims of Healthy Solutions…**they are barred by the release and (stipulation of dismissal filed in the Related Action.)**

Opposition at 9.  (emphasis added).

Thus, DMC's Opposition argument blatantly contradicts its earlier representation to this Court.  Accordingly, this Court should refuse to enforce such an obvious effort by DMC and its counsel to subvert this Court's authority and integrity.  Although a Permanent Injunction remains in place to preserve Cappseals' right to payment for goods it manufactured and sold, DMC has sought to circumvent the injunction by obtaining the Court's approval of its Stipulation based on a clear **misrepresentation to this Court.**

---

[3] The Court issued an injunction in the Related Action "enjoining Healthy Solutions, L.L.C. d/b/a Direct Business Concepts from selling, compromising, transferring, assigning, or otherwise disposing of, alienating or hypothecating its interest in any and all monies due or to become due to DBC from ITV Direct for the manufacture and shipment of Supreme Greens to ITV Direct or its interest in any and all intellectual property related to Supreme Greens." Preliminary Injunction dated April 14, 2004.  (Dkt. No. 10) (the "Injunction") and attached hereto as **Exhibit B** to Antonelli Affidavit.  This injunction was made permanent by the Court in an order dated April 1, 2005 (Dkt. No. 91) and attached hereto as **Exhibit C** to Antonelli Affidavit

[4] In the referenced release, the parties specifically represented that each party had "the legal capacity to compromise and release all claims provided here; **except to the extent that FTC consent, court approval or the consent of Cappseals, Inc. is required.**" Release at ¶ 5.A.  Thus ITV and Healthy Solutions expressly recognized that the Court's approval was condition precedent to the validity of the Release.

The case of *In re Sanborn, Inc.*, 181 B.R. 683, 691 (Bankr. D. Mass. 1995) is instructive on this point.   In *Sanborn*, the debtor and reach and apply defendant were subject to an injunction that prevented, among other things, the parties from releasing claims.  Despite the injunction, they executed a release that they argued was not covered by the earlier injunction issued by the Suffolk Superior Court. The bankruptcy court found that the release was "fashioned by both parties to violate the injunction."  *Id.*  It refused to enforce an agreement that the parties "had been expressly or **impliedly forbidden**" by the injunction to make. (emphasis added). *Id.*, citing *Nussenbaum v. Chambers & Chambers, Inc.*, 322 Mass. 419, 421 (1948). Moreover, in response to their argument that the debtor would not be harmed, the Court stated:

> The [reach and apply plaintiff] which obtained the injunction was certainly harmed by the [release] and the **integrity of the Suffolk Superior Court was an intended victim as well.**

*Id.* (emphasis added).

Plainly, DMC's argument in its Opposition contradicts its own representation to the Court that the Release "would not affect the rights of any party."  The Opposition exposes the Release's true purpose, namely to contravene the injunction, which was meant to preserve security for Cappseals' attempt to recover payment on the goods sold.  DMC acted despite the fact that this Court granted injunctive relief based on an **"**express finding that Cappseals, Inc. will suffer irreparable harm if the account receivable held by…[Healthy Solutions]…is not protected from …compromise."   Injunction dated April 14, 2004.  By fashioning a release which extinguishes all of Healthy Solutions' claims and which releases ITV and DMC from any liability arising under the Purchase Order, DMC has subverted the purpose of the Court ordered Injunction.  Furthermore, by stripping ITV of any assets, Cappseals cannot collect its Judgment from ITV.  Therefore, to the extent DMC now argues that the Release prevents Cappseals from recovering on a co-obligor or alter ego theory, which contradicts its earlier representation, this

Court should find the Release unenforceable as an illegal contract. See *Sanborn,* 181 B.R. at 691, citing *Nussenbaum v. Chambers & Chambers, Inc.*, 322 Mass. 419, 421 (1948).

## II.     CAPPSEALS MAY SUE DMC ON AN ALTER EGO THEORY EVEN THOUGH IT WAS NOT A PARTY TO THE JUDGMENT.

DMC also argues that the reach and apply statute does not allow Cappseals to pursue its claims because they are entirely derivative of Healthy Solutions' rights.  Opposition at 11.  In addition, it argues that Cappseals may not sue DMC because it was not a party to the Judgment. Notwithstanding DMC's sweeping assertions, Cappseals may bring a second action against DMC which asserts an alter ego claim in order to execute on the Judgment.

Courts recognize a judgment creditor's right to raise an alter ego claim in a second suit to collect a judgment from a party not named in the prior judgment.  *C.F. Trust Inc. v. First Flight*, 140 F.Supp.2d 628, 645 ¶ 55 (E.D. Va. 2001)(because plaintiffs have proven grounds to pierce veil they are entitled to order declaring affiliates alter egos and their assets are subject to the prior judgment), aff'd by *C.F. Trust, Inc. v. First Flight ltd. P'ship*, 2003 U.S. App. Lexis 15013 (4th Cir. 2003).  Furthermore, the fact that DMC was not a party to the Judgment does not affect Cappseals' right to pursue recovery from DMC.  *H.H. Robertson Co., Cupples Prods. v. V.S. DiCarlo Gen. Contractors*, 994 F.2d 476, 478 (8th Cir. 1993)(The "fact that [alter egos] were not themselves either judgment debtors or parties in the original action is irrelevant."); *Accord Data Gen. Corp. v. Grumman Data Sys. Corp.*, 886 F. Supp. 927, 931 (D. Mass. 1994) *Alman v. Danin*, 801 F.2d 1, 3-5 (1st Cir. 1986)(upholding summary judgment against alter ego shareholders).

Here, Cappseals has invoked this Court's jurisdiction to enforce its judgment against DMC. Nothing precludes Cappseals from stating an alter ego claim against DMC in a second

action against DMC to collect on the Judgment.[5]  Moreover, the alter ego claim does not depend

on Healthy Solutions' claims because Cappseals now holds a judgment against ITV.  Therefore,

even if Cappseals were moving for summary judgment on its reach and apply claim, which it is

not, Cappseals would rely on its judgment against ITV.  Cappseals' statutory rights are thus

unaffected by the Stipulation.

## III.    THIS COURT SHOULD NOT APPLY THE DOCTRINE OF MERGER TO BAR CAPPSEALS' RIGHT TO RECOVER AGAINST DMC.

As a threshold matter, this Court should refuse to apply the doctrine of merger in this

case.  As Cappseals' Motion for Summary Judgment and this Reply demonstrate, post-judgment

discovery reveals that DMC has unequivocally attempted to hinder and delay Cappseals' right to

collect on this Court's Judgment in favor of Cappseals.  In addition, this Reply exposes

DMC/ITV's effort to mislead this Court with respect to its representation concerning the effect

of the Release and Stipulation on Cappseals' post-judgment collection rights.  Accordingly this

Court should refuse to reward DMC for its obstructionist and bad faith tactics.

Contrary to DMC's assertions, the doctrine of merger has limits in its application.

Numerous courts recognize that equitable concerns qualify the application of the doctrine where

its effect frustrates the "ends of justice." See *United States v. Ringley*, 750 F. Supp. 750, 757 (D.

Va. 1990)("The doctrine of merger may be carried no further than the ends of justice require… It

would be inequitable for the partners to elude payment…based upon their merger argument.");

*Orix Credit Alliance v. Horten*, 965 F. Supp. 481, 485 (D.N.Y. 1997)(doctrine should not be

applied in "rigid or technical manner"); Accord *United States v. Peckham*, 72 F.3d 672, 675 (8th

---

[5] This case is distinguishable from *Lonnqvist v. Lammi*, 242 Mass. 574 (Mass. 1922) where the creditors raised no alter ego claim, nor, the Court noted, did they even raise an agency theory.  Significantly, the *My Bread* analysis turned on an agency theory.  Cf. *My Bread v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968)("Additional facts may be such as to permit the conclusion that an **agency** or similar relationship exists between the entities…In such circumstances, in imposing liability upon one or more of a group of "closely identified" corporations, a court "need not consider with nicety which of them" ought to be held liable for the act of one corporation "for which the plaintiff deserves payment.")(emphasis added).

Cir. 1995)(application of doctrine limited by "equitable concerns"); *Byram v. Miner*, 47 F.2d 112, 119 (8th Cir. 1931); *Cutler Hardware Co. v. Hacker*, 238 F. 146, 147 (5th Cir. 1916) (merger in judgment is the "general rule, yet according to recognized exceptions the judgment will be construed as a new form of the old debt when justice and equity require."); *In re Koch*, 54 B.R. 26, 28 (Bankr. D. Wis. 1985)("The doctrine of merger of a cause of action in the judgment rendered thereon is calculated to promote justice, and will be applied with due consideration of the demands of justice and equity, it may be carried no further than the ends of justice require."); *Burke v. Burke*, 86 A.2d 51, 53 (Del. Ch. 1952).

In its Memorandum of Summary Judgment in the Related Action dated July 20, 2005 ("Memorandum")[6], this Court expressly recognized that ITV may not "avoid its obligation to pay for the goods it accepted from Healthy Solutions." Memorandum at 5.   In doing so, this Court relied on the principles of *Travenol Laboratories, Inc. v. Zotal, Ltd*, 394 Mass. 95, 100, (1985), where the SJC stated that "it furthers the values of certainty and predictability and is thus consistent with the public interest, that a seller be entitled to the price of goods accepted." Similarly, in *My Bread v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968), the SJC stated

> In imposing liability upon one or more of a group of "closely identified" corporations, a court "need not consider with nicety which of them" ought to be held liable for the act of one corporation "for which the plaintiff deserves payment."

Put simply, DMC and ITV - corporate alter egos of one another - should not be allowed to invoke the doctrine of merger to frustrate the ends of justice and "further delay payment for goods delivered, accepted, and re-sold." Memorandum at 6.

---

[6] Attached hereto as **Exhibit D** to Antonelli Affidavit.

**IV.    CAPPSEALS IS ENTITLED TO SUMMARY JUDGMENT ON ITS ALTER EGO
CLAIM BECAUSE DMC RAISES NO ISSUE OF MATERIAL FACT.**

To prevent summary judgment, the factual dispute must be both "material" and
"genuine." An issue is "genuine" where only a finder of fact can properly resolve it because it
may reasonably be resolved in favor of either party and an issue is "material" where it affects the
outcome of the suit. *Collins v. Martella,* 17 F.3d 1, 3 n. 3 (1st Cir.1994)(original quotes and
citations omitted). Mere allegations or conjecture that are unsupported in the record are
insufficient to raise a genuine issue of material fact. *Horta v. Sullivan,* 4 F.3d 2, 11 (1st
Cir.1993). Questions of law are appropriate for resolution on summary judgment where a
genuine dispute of material fact is absent. *Jimenez v. Peninsular & Oriental Steam Navigation
Co.,* 974 F.2d 221, 223 (1st Cir.1992).

Cappseals is entitled to summary judgment on its alter ego claim because DMC raises no
genuine dispute of material fact concerning its status as ITV's alter ego. It cannot argue that the
two entities are run as a common enterprise. DMC's conclusory and unsupported statement that
there is "no evidence" of a confused intermingling of business activities is preposterous in light
of the facts revealed in post-judgment discovery. Because the material facts relevant to the
dispositive legal issues on summary judgment are not in genuine dispute, summary judgment on
Cappseals' claims is warranted.

**A.    The "facts" on which DMC relies to resist summary judgment are
unsupported.**

DMC concocts a series of convoluted "facts" to present a version of events unsupported
by and belied by its own indisputable financial records. Nevertheless, as demonstrated by the
affidavit of Andrew P. Prague[7] submitted with this reply, none of these conclusory and

---

[7] Mr. Prague has been a Certified Public Accountant since 1985 and possesses a Juris Doctor and LLM in taxation.
He has extensive experience in general ledger accounting, tax preparation, forensic accounting and the use of the

unsupported statements withstand even minimal scrutiny. Undisputed are the facts that the two legally separate entities are controlled by the same persons, share the same address shareholders and accountants, and act as one integrated business entity with ITV having no purpose other than to receive cash transfers from DMC and remit payment to media outlets for purchases made on DMC's behalf. Accordingly DMC offers insufficient evidence to dispute that DMC and ITV are alter egos.

For example, Mr. Barrett states in his affidavit that DMC's purpose is to "search[] out products and people that it believes will work well together in an infomercial, and provid[e] the administrative services in connection with selling such products via infomercials." Barrett Aff., ¶ 2. He asserts that ITV's purpose is to "purchas[e] the media and **produc[e] the infomercials for future products located by DMC**." *Id.*, ¶ 5. The DMC and ITV Financial Records belie these statements. Prague Aff., ¶ 13. Specifically, ITV, through July 20, 2005, acted as a pass-through entity through which it purchased Media Buys utilized by DMC in the operation of its business using funds provided by DMC. "ITV did nothing else." *Id.* DMC purchased and sold the product, produced the infomercials, and engaged in other related activities. *Id.* Even the persons acting as media buyers were employed by DMC. Barrett Dep., pp. 12-13.[8] Notably, Mr. Barrett omits in his description of the two entities which entity was responsible for or engaged in the actual purchasing and selling of the product. Barrett Aff., 2. However, it is clear that those functions were performed solely by DMC. Prague Aff., ¶ 13.

Mr. Callahan similarly testifies in his affidavit: "As security for the advances of funds provided to ITV, the value of the inventory of Supreme Greens product was carried on the books of DMC. Again, the expectation was that this inventory would be moved to the books of ITV

---

accounting software used by DMC and ITV. Affidavit of Andrew P. Prague attached hereto as Exhibit 1 ("Prague Aff."), ¶¶ 1-3.
[8] Attached hereto as Exhibit **E** to Antonelli Affidavit.

once DMC had recovered its advanced funds and overhead expenses.  That never occurred."
Callahan Aff., ¶ 7.  These statements are ludicrous and absurd after a review of Mr. Callahan's
own financial records.  Prague Aff., 18.  First, no accounting practice permits listing as inventory
product which serves as "collateral" or "security" for a loan on the books of the creditor.  *Id.*
Second, the Balance Sheets, General Ledger and the Tax Returns clearly indicate that no loan or
other liability existed as between ITV and DMC.  *Id.*  Third, not only did *DMC* purchase the
products, it identified the purchases as an indebtedness on its books and records in the amounts
owed to Healthy Solutions.  *Id.*  Mr. Callahan also states in his affidavit that sales of the Supreme
Greens product were made by ITV.  Callahan Aff., ¶ 8.  This statement is patently false.  Prague
Aff., 19.  The DMC Financial Records indisputably show that DMC, not ITV, sold the Supreme
Greens product.  *Id.*

In short, although DMC argues that ITV was the party that directed the marketing,
promotion and sale of Supreme Greens, DMC/ITV's financial records belie these statements.
Moreover DMC's supporting affidavits totally contradict the testimony of these affiants at prior
depositions.  The undisputed facts show that DMC's argument can't hold up to even minimal
scrutiny.

**1.     DMC's and ITV's financial records show that ITV was nothing more
than a pass through entity.**

DMC's and ITV's financial records are damning in their demonstration that ITV acted as
a pass-through for DMC.  There is no question that for 2004 and 2005, ITV's only function was
to receive periodic distributions from DMC characterized as "media buys" and then write checks
to various media outlets such as radio stations.  ITV's 2003 and 2004 Tax Returns and General
Ledger entries for 2003-September 30, 2005 ("ITV Financial Records") show that ITV had no
salaried employees or compensated officers during that time. Prague Aff., ¶ 7.   ITV had no

material assets or liabilities during that period.  *Id.* at ¶ 8.  The ITV Financial Records reveal that its sole business function was to receive lump sum transfers of funds from DMC on a periodic basis, and to issue checks and/or other forms of payment to media outlets for the purpose of making media purchases.  *Id.*  These transactions are characterized in the ITV Financial Records as "Media Buys".  *Id.*  ITV characterized the transfers it received from DMC as revenue, and the Media Buy expenditure as "cost of goods sold."  *Id.*  ITV's only material source of Revenue was DMC and ITV engaged in no material activity other than acting as a conduit for DMC to purchase media.  *Id.*  DMC provided ITV with virtually all of its revenue and its very business existence.  *Id.*

The ITV Financial Records show that ITV neither operated at a loss nor made any substantial profits during the period 2003 through September 30, 2005.  *Id.* at ¶ 9.  Although incomplete, the records suggest that during the first nine months of 2005 ITV incurred approximately a $120,000 loss on $9,991,216.75 of revenue transferred from DMC; this is because it was simply a pass-through for DMC for the purpose of making Media Buys.  *Id.*  In other words, DMC transferred the money to ITV, and ITV made the purchases.  *Id.*  The ITV Financial Records demonstrate that DMC and ITV abandoned this "pass-through" function on or around July 20, 2005, the date of the summary judgment Memorandum.  *Id.* Subsequently, DMC's General Ledger entries show that DMC began directly making the Media Buys itself. *Id.*[9]

Furthermore, contrary to Messrs. Barrett's and Callahan's statements in their affidavits, the parties' financial records show no evidence of loans or liability on the part of ITV to DMC with respect to the transfers.  *Id*. at ¶ 14.  Instead, the transfers were characterized as "revenue"

---

[9] Interestingly, DMC never offers an explanation for why ITV stopped executing these transactions precisely after this Court issued the Judgment.

by ITV and "cost of goods sold" by DMC. *Id.*  These intercorporate transfers, and the manner in which they were characterized, indicate that, contrary to Mr. Barrett's statement, the two corporations were operated as one business.  *Id.*

In addition, Mr. Barrett suggests that ITV suffered a "significant loss" in its business, caused in part by the FTC and FDA's alleged actions with respect to Supreme Greens.  Barrett Aff., ¶ 5.  However, the DMC and ITV Financial Records demonstrate that the ITV/DMC business generated significant profits in 2003 and 2004.[10]  *Id.* at ¶ 15.  All of these facts demonstrate that DMC and ITV were run as a common enterprise and they are thus alter egos of one another.

> ## 2.  The records show that DMC promoted and sold the Supreme Greens supplements.

The 2003 and 2004 Tax Returns and General Ledger entries for 2003 through November 30, 2005 of DMC ("DMC Financial Records") show that DMC's business was to acquire, sell and distribute various health supplement products, produce and sell infomercials and other advertising materials for the sale of such products, and engage in related business activities.  *Id.* at ¶ 10.  These records expressly contradict Mr. Barrett's assertions that DMC acted as merely a secured lender to ITV.  Barrett Aff., ¶¶ 2-5.  This is apparent from the business description in the tax returns, and the journal entries and categorization of accounts in the General Ledger.  Prague Aff., ¶ 10.  In short, the statements of Messrs. Callahan and Barrett are conclusory and entirely unsupported by the DMC and ITV Financial records.  Affidavits containing arguments and

---

[10] "In 2003, DMC recorded approximately $34.4 million in revenue, and from that amount compensated its two shareholders, Messrs. Maihos and Barrett a total of $780,000, and distributed to Messrs. Maihos and Barrett an additional $844,217.  In 2004, DMC recorded approximately $33.8 million in revenue, and from that amount compensated its two shareholders Messrs. Maihos and Barrett $1,024,000 and distributed to Messrs. Maihos and Barrett $1,388,653."  Prague Aff., 11.  In these two years, they received $4 million despite the fact that Healthy Solutions remained unpaid for goods sold and delivered.

conclusory assertions will be stricken and given no weight in summary judgment. *Murphy v. Ford Motor Co.,* 170 F.R.D. 82, 85 (D. Mass 1997).

Furthermore, the DMC Financial Records show that in 2003 and 2004, DMC purchased the Supreme Greens product from Healthy Solutions,[11] recorded the Supreme Greens product after delivery in its inventory, and sold the product, recognizing the sales as revenue. *Id.* at ¶ 12. Moreover, DMC recognized amounts owed to Healthy Solutions for the delivery of Supreme Greens as an indebtedness or "account payable" on its books and records. *Id.* Thus, during all material times, DMC recorded in its books and records the purchase of the Supreme Greens product, the indebtedness owed to Healthy Solutions, and the subsequent sale of the product to DMC's customers. *Id*. at ¶ 16. The records also show that DMC has borne the cost of litigation related to Supreme Greens. *Id.* at ¶ 20.

DMC's and ITV's Financial Records show that ITV has had no role other than functioning as a straw entity to remit payment for media purchases used by DMC to promote the sale of Supreme Greens. They also show that DMC actively transferred money to ITV for media purchases until the Judgment was issued. Thereafter, by ceasing to even temporarily transfer cash to ITV's bank accounts, DMC left ITV with no material assets that could be used to satisfy the Judgment. *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17 (1st Cir. 1985)(after dispute funds that might have been available were commingled with other entities). These facts exist notwithstanding DMC's unsupported assertions to the contrary.

*My Bread v. Cumberland Farms, Inc.*, 353 Mass. 614 (1968) stands for the proposition that a court may disregard corporate separateness when the facts indicate that related companies are one. The facts in this case are unequivocal with respect to whether the two companies are

---

[11] DMC's only response to the fact that it also issued Purchase Order 1101 is to label this a mistake. Opposition at 7. Nevertheless, DMC paid for by check the purchases of Supreme Greens it received. Prague Aff., ¶ 12.

one.   Although legally separate, they share the same employees, address, owners, control

persons, and accountants.   They are run as a single enterprise for the benefit of Messrs. Barrett

and Maihos.   *Pepsi-Cola Metro. Bottling Co.*, 754 F.2d at 14 (1st Cir. 1985)(entities "run as

single enterprise for the benefit of owners).   ITV is a straw with no employees whose only

function is to remit payment for media purchases made on DMC's behalf.   Mr. Barrett has

admitted that the formation of ITV was for no other reason other than his personal preference to

make use of the word "TV" a company name.   See Section IV(B)(5) *infra*.   He has admitted that

there is no distinction (beyond their names) between DMC and ITV.   Under the principles of *My

Bread*, DMC and ITV are alter egos run as a common enterprise.

### B.    DMC's Disputed "Statement of Facts" does not dispute Cappseals' Statement of facts.

Unsurprisingly, DMC does not oppose any of the twenty one factual allegations

contained within Cappseals' Rule 56.1 statement.   Many of the factual assertions within these

paragraphs were confirmed by deposition testimony from – and affidavits filed by - DMC's own

principals.   The remaining statements were culled from DMC's own financial records. More

importantly, nowhere within its statement filed pursuant to Rule 56.1 did DMC object, oppose or

question any of the factual allegations within the above cited paragraphs.    Accordingly, all of

these facts have been deemed admitted for the purposes of this summary judgment process.

> Opposition to motions for summary judgment shall include a concise
> statement of the material facts of record as to which it is contended that
> there exists a genuine issue to be tried, with page references to affidavits,
> depositions and other documentation.   Copies of all referenced
> documentation shall be filed as exhibits to the motion or opposition.
> **Material facts of record set forth in the statement required to be
> served by the moving party will be deemed for purposes of the motion
> to be admitted by opposing parties unless controverted by the
> statement required to be served by opposing parties.**

Rule 56.1 (emphasis added).

### C.    There are no Material Facts in Genuine Dispute.

In addition, although DMC submits thirteen statements of "material facts" which it labels are "in dispute" the vast majority of these statements while purporting to represent "disputes" of material fact are: (1) statements undisputed by Cappseals, (2) conclusions of law, (3) statements based on a lack of personal knowledge, (4) statements totally contradicted by DMC's own financial records and (5) statements from "sham" affidavits which contradict earlier deposition testimony.

### 1.    The material facts are not in genuine dispute.

In its Opposition, DMC does not dispute any of the twenty one statements of material fact submitted by Cappseals in its Concise Statement.  Similarly, Cappseals has never disputed many of the facts which DMC incorrectly asserts are disputed in its Statement of Disputed Facts ("SDF").  Specifically, DMC's statements with respect to the related action and the Judgment are undisputed.  ("SDF"), ¶¶ 1-3.  Also undisputed is that the parties are incorporated separately or that they maintain separate bank accounts and separate general ledgers.  SDF, ¶ 4.  It is also undisputed that Healthy Solutions did not take action against DMC in the related action.  SDF, ¶ 12.  Nor does Cappseals dispute that ITV entered into a settlement agreement with Healthy Solutions.  SDF, ¶ 13.  However, whether the release operates to release Healthy Solutions claims against DMC is a question of law to be addressed by this Court, not a fact.  *Id.*

Significantly, in its Opposition DMC fails to address the fact that its own bank records show that after this Court issued judgments to Cappseals and Healthy Solutions, ITV ceased its "operations" leaving ITV judgment proof.  Furthermore, DMC does not dispute the fact, demonstrated by DMC's own financial records, that DMC generated all of the revenues, which exceed sixteen million dollars, on the sale of Supreme Greens.  In short, DMC offers no facts to

contradict what its own records show - that ITV was nothing more than a "pass-through" as Cappseals has alleged.

### 2.    DMC submits conclusory statements.

Personal knowledge contained in affidavits must concern facts, as opposed to conclusions, assumptions or surmise. *Perez et al. v. Volvo Car Corp.,* 247 F.3d. 303, 316 (1st Cir. 2001). Affidavits containing arguments and conclusory assertions will be stricken and given no weight in summary judgment. *Murphy v. Ford Motor Co.,* 170 F.R.D. 82, 85 (D. Mass 1997); s*ee also Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991)(stating that conclusory allegations do not pass muster and must be disregarded); *Wynne v. Tufts Univ. School of Medicine,* 976 F.2d 791, n.1 (1st Cir. 1992) (Court disregarded affidavit as a sufficient basis for summary judgment as it was merely a "simple conclusory averment..."). In addition to the many undisputed facts submitted by DMC, many of the allegedly disputed facts are simply conclusory or argumentative assertions based on the statements of Messrs. Callahan and Barrett which, aside from not being facts, are totally contradicted by their deposition testimony and by documents produced from ITV and DMC. For example, the Fifth Paragraph contains statements that attempt to explain away undisputed facts. SDF, ¶ 5. The statements themselves are not facts. Similarly, DMC offers a legal conclusion by stating that DMC "never had…a contract with Healthy Solutions" and that the release operates to compromise Healthy Solutions' claims against. SDF, ¶¶ 6, 12, 13.[12]

### 3.    Lack of personal knowledge

Fed. R. Civ. P. 56(e) requires that affidavits be made on the personal knowledge of the affiant. Affidavits based upon "information and belief" do not satisfy the requirements of Rule

---

[12] In addition, the Distribution Agreement is irrelevant to the issues in this case because the Court has already held that the Purchase Order, not the Distribution Agreement, created the contractual obligations that gave rise to the Judgment. SDF, ¶ 6, 12. Memorandum at 5.

56(e) and are therefore not entitled to weight in the summary judgment calculus. *Perez,* 247 F.3d. at 315 (excluding portions of affidavit which affiant lacked personal knowledge); *Sheinkopf,* 927 F.2d at 1271 (Court treated verified complaint as a Rule 56(e) affidavit and afforded appellant's statements made upon "information and belief" no weight in summary judgment); *Murphy,* 170 F.R.D. at 84 (striking paragraphs of affidavit based on affiant's belief).

The statements in Paragraphs 7 and 8 are based on Messrs. Callahan's and Barrett's testimony.  SDF, ¶¶ 7,8.   Mr. Callahan makes these statements on "information and belief" repeating almost verbatim statements made by Mr. Barrett with respect to ITV's obligations to DMC with respect to funds used to purchase media, and the alleged losses sustained by ITV. Prague Aff., ¶ 7.  Accordingly, not based on personal knowledge, these statements should be stricken.  Moreover, "Mr. Callahan's statements are completely false, and are expressly contradicted by the accounting records which he has testified he created." *Id.*  See Sections IV(A)(1) & (2) *supra*.

### 4.    Facts unsupported by the record.

After parsing out these undisputed and conclusory facts, DMC is left with statements in Paragraphs 7 through 10 that attempt to explain away and contradict its own financial records and its principals' deposition testimony.  SDF, ¶¶ 7-10.  DMC asserts, based on Donald Barrett's affidavit and Mr. Callahan's parroted statements that DMC acted as a secured lender to ITV so that ITV could promote the sale of Supreme Greens.  *Id.*  As discussed above in Sections IV(A)(1) & (2) *supra*, the statements in paragraphs 7 through 10 are flatly belied by DMC's own financial records.

Finally, Paragraph 11 relies on Mr. Callahan's affidavits to aver that no fraudulent transfers took place. However, when asked about the concept of fraudulent transfers less than two months ago, Mr. Callahan had this to say:

Q – What's your understanding of a fraudulent transfer?
A – Fraudulent transfer? I don't have any understanding of it.
==
Q – I am asking you if you have any understanding whatsoever of
the term "fraudulent transfer"?
A – I have heard of fraudulent conveyance. I have heard of that
before. I think it pertains to real estate.
==
Q – Do you feel qualified to describe something as being a
fraudulent transfer?
A – Legally, no. I don't feel qualified.

Callahan Dep. at 161-63, lns. 9-24; lns 23-4; ln1.[13]

Thus, these statements are totally unsupported, and to the extent they contradict Mr.

Callahan's prior deposition testimony they should be ignored as sham affidavits as discussed

below.

### 5.    The supporting affidavits are shams.

It is well settled in the First Circuit that "when an interested witness has given clear

answers to unambiguous questions, he cannot create a conflict and resist summary judgment with

an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the

testimony is changed. *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1 (1st Cir.

1994)(Court disregarded affidavit in considering summary judgment motion). "The purpose of

the sham affidavit rule is to protect the integrity of summary judgment." *Mahan v. Boston Water

and Sewer Comm'n,* 179 F.R.D. 49, 53 (D.Mass.1998). The purpose of summary judgment is

defeated if a party can offer a post-deposition affidavit that contradicts earlier sworn deposition

testimony "without explanation." *Id.* Accordingly, the affidavits of both Wayne Callahan and

Donald Barrett should be stricken as shams.

Wayne Callahan's testimony is replete with contradictions of his earlier post-judgment

deposition testimony. It should be stricken in its entirety. With respect to DMC's alleged

---

[13] Attached hereto as **Exhibit F** to Antonelli Affidavit.

characterization of its "advance" of money to ITV as a debt, supported by Mr. Callahan's

affidavit, this statement totally contradicts Callahan's deposition. Specifically, in his affidavit,

Callahan states that "sales of Supreme Greens were made by ITV." Callahan Aff., ¶ 8.

However, Mr. Callahan earlier testified at his post-judgment deposition as follows.

> Q – Did you prepare this document?
> A – Yes
> Q – Does it indicate that **DMC** generated net revenues related to
> **its Supreme Greens business** of $14,683.436.24 during the period
> of January 1, 2003 to June 30, 2004?
> A – Yes.
> Q – Using the Procedure established by PKF[14], you concluded that
> **DMC** had incurred total direct costs of $13,021,676.80 associated
> with its Supreme Greens business for the period January 1, 2003,
> through June 30, 2004, Correct?
> A - ….Yes.
> Q – Is it your belief that the $13 million approximately, indicated
> on ITV00552 is in any way inaccurate?
> A – No.

Callahan Dep. at 126-28 (emphasis added).

Thus, Mr. Callahan's earlier deposition testimony shows unequivocally that: (1) he

asserted that **DMC** – not ITV which he now states - was the seller of Supreme Greens and (2)

that DMC correspondingly was not ITV's secured lender.

Mr. Callahan also purports to have knowledge about ITV's business strategy. Callahan

Aff., ¶¶ 5-8. These statements similarly contradict his earlier deposition testimony.

> Q – Do you have an understanding as to what ITV Direct does as a
> business?
> A – It is a media buying agency.
> Q – Is that all that is does?
> A – **I don't know what else it does, no.** I don't know that. **I just
> record the transactions.** I don't know the other businesses. These
> are the types of transactions that I record.

Callahan Dep. at 62-63, lns. 22-23; 2-7 (emphasis added).

---

[14] The independent CPA firm which produced the accounting report pursuant to Court Order in the matter *Federal Trade Commission v. Direct Marketing Concepts, Inc. et al*, Civil Action No. 04-11136-GAO.

> Q – Are you familiar with ITV Direct's relationship with Healthy
> Solutions?
> A – I am not.

*Id*. at 92-93, lns. 21-24; 1-3.

> Q – Who performed that service [of placing and buying the media
> at ITV Direct]?
> A – I do not know who performed that service.

*Id*. at 189, lns. 20-21.

DMC further states that ITV credited the amount it received on sales of Supreme Greens to DMC, effectively paying down its debt to DMC. However this never happened. In explaining ITV's expenditures, Mr. Callahan stated the following.

> Q – Well, is that $11,887,000 number made up exclusively of
> money transferred to media outlets?
> A – Yes. I want to point out that's a cost from ITV Direct paid out
> to media outlets.

*Id.* at 188, lns. 14-18.

In short, at his deposition, Mr. Callahan testified that ITV was a media buying agency with no employees whose sole source of revenue was from DMC and whose expenses consisted entirely of money paid out to media outlets. ITV's function was to remit payment for media purchases that DMC used to promote the sale of Supreme Greens. (Callahan Aff. At 63, lns.1-16). ITV performed this role with no employees. (Callahan Aff. At 89, lns. 23). His testimony and the financial records conclusively bear this out. As a media buying agency, ITV's only "revenue" came from DMC. Unsurprisingly, ITV's own financial records show that it recorded no revenue from the sale of Supreme Greens. ITV spent all of the money it received to purchase media.[15] (Callahan Aff. at 188, lns.8-17). No money remained, nor did DMC intend for any to remain, for ITV to "repay" DMC for "advances" as DMC speciously argues. No money remains,

---

[15] More precisely, ITV spent **99.53%** of its revenue on media purchases in 2004.

because as Mr. Callahan admitted, all costs were spent on media purchases.  No money was ever "owed" to DMC since ITV was DMC's straw created to write checks to media outlets - it had no employees, office furniture, or other necessary assets.

Notwithstanding this testimony, Mr. Callahan now states, based on a total absence of supporting facts, that ITV has been the party promoting Supreme Greens and that DMC lent or advanced money to ITV and has been its secured creditor.   In short, this is fiction.

Similarly, Donald Barrett's affidavit testimony should be stricken as a sham. Although he now states that ITV was the entity responsible for promoting Supreme Greens, he earlier stated the reasons for establishing ITV as well as the absence of any meaningful difference between ITV and DMC:

> Q:  I want to make sure I understand this.  ITV Direct essentially produces the infomercials, and Direct Marketing Concepts answers the phone, places the orders, that sort of thing, is that a fair statement?
>
> A:  I really came up with ITV Direct because I liked the name more.  I kind of weaseled, not weaseled but said ITV Direct, we can use that it for the production end of it and we'll use Directing Marketing Concepts for the bank end of the business.  I liked the ITV name.  It incorporated TV.  I just liked the name better.  That's frankly why I did it.

Barrett Dep. pp. 10-11.

Similarly, although he now asserts that ITV (which unequivocally has no employees) was charged with promoting Supreme Greens and producing infomercials, he earlier testified as follows.

> A - We have about 200 employees.
> Q - Is that ITV Direct, or is that Direct Marketing Concepts?
> A – Both.  I think everyone is paid out of Direct Marketing Concepts.
> Q – Give me an idea what the other thirty people do?
> A – We have media buyers, about five media buyers.

Barrett Dep. pp. 12-13.

Because the affidavits of Messrs. Callahan and Barret expressly contradict their deposition testimony, the affidavits should be ignored as shams intended to create factual disputes when none exists.

## **CONCLUSION**

For the reasons sets forth herein Cappseals' Motion for Partial Summary Judgment should be GRANTED.


Cappseals, Inc.
By its attorneys,


/s/ Peter Antonelli
Daniel J. Kelly, BBO # 553926
dkelly@ghlaw.com
Scott A. Silverman, BBO # 638087
ssilverman@ghlaw.com
Peter Antonelli, BBO # 661526
pantonelli@ghlaw.com
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  02110
(617) 345-7000

## CERTIFICATE OF SERVICE

I hereby certify that true and accurate copies of the foregoing *Cappseals, Inc.'s Reply to DMC's Opposition* was served on the foregoing attorneys of record pursuant to Fed. R. Civ. P. 5 as follows:

Via electronic notification:

Peter S. Brooks          pbrooks@seyfarth.com

Susan W. Gelwick        sgelwick@seyfarth.com

Christopher F. Robertson      crobertson@seyfarth.com


                                        /s/ Peter Antonelli
                                        Daniel J. Kelly BBO# 553926
                                        dkelly@ghlaw.com
                                        Scott A. Silverman, BBO #638087
                                        ssilverman@ghlaw.com
                                        Peter Antonelli BBO # 661526
                                        pantonelli@ghlaw.com
                                        Gadsby Hannah LLP
                                        225 Franklin Street
                                        Boston, MA 02110
DATED:  December 13, 2005               (617) 345-7000

B0440462v1