**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CAPPSEALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DIRECT MARKETING CONCEPTS, INC., et al.,<br><br>Defendants. | CIVIL ACTION NO. 05-CV-11907-JLT |

**SURREPLY OF DEFENDANT DIRECT MARKETING CONCEPTS, INC.**

The defendant Direct Marketing Concepts, Inc. ("DMC"), hereby submits this surreply in response to the Reply memorandum submitted by the Plaintiff Cappseals, Inc. ("Cappseals") in support of its Motion for Partial Summary Judgment against DMC.

**A. DMC Is Not Estopped From Asserting Its Defenses In This Action By Any Alleged Fraud On The Court In The Related Action.**

Cappseals spends the first section of its Reply brief arguing that the September 13, 2005 Stipulation of Dismissal ("Stipulation") filed by ITV and the Healthy Solutions Defendants in the related action (C.A. No. 04-10421-JLT) ("Related Action") and approved by the Court on October 24, 2005 (over Cappseals' objections) constitutes a fraud on the Court and thereby should estop DMC from raising its defenses in this action. (Reply at 3-5.) Specifically, Cappseals notes that the Stipulation asserted that the compromise, release and settlement would not affect the rights of any other party. (Id. at 3.) Having filed a new action, Cappseals now argues that DMC is not entitled to oppose Cappseals' motion for summary judgment in this action on the basis that that Cappseals' co-obligor and alter ego claims (necessarily derivative of Healthy Solutions' claims) are barred by the release and Stipulation in the Related Action. This defense, Cappseals asserts, contradicts the earlier representation made in the Stipulation that no

rights would be affected. Accordingly, Cappseals asks the Court to refuse to enforce the release.[1] Cappseals' argument fails for a number of reasons.

First, as the Court will recall, in the Related Action, final judgment was entered in favor of Cappseals and against ITV on its reach and apply claim under Rule 54(b) **before** the filing of the Stipulation. Thus, Cappseals' derivative "rights" as a reach-and-apply plaintiff were already established in the judgment and could not have been impaired by the release and Stipulation.[2] Second, as Cappseals surely knows, DMC was not a party in the Related Case. Yet its Reply is replete with false and misleading assertions that DMC filed the Stipulation (page 2) and made representations to the Court in the Related Action. For example, Cappseals states (page 1) that its Reply is necessary to "expose DMC's earlier representations to this Court. . . ." On page 3 Cappseals asserts that "DMC's Opposition argument blatantly contradicts its earlier representations to this Court" and that "DMC has sought to circumvent the [permanent] injunction by obtaining the Court's approval of its Stipulation based on a clear misrepresentation to this Court." (emphasis omitted). None of these assertions are correct, as Cappseals well knows, and the obvious intent of Cappseals' fabrications is to poison the water against DMC in defending against Cappseals' summary judgment motion.

The fact is that ITV and Healthy Solutions, **the actual parties to the Stipulation**, could not have known that Cappseals would initiate a new lawsuit against DMC and seek summary

---

[1] Cappseals has not filed any motions in the Related Action that seek to undo or limit the release and Stipulation. Cappseals does not explain how the Court in this action can make a ruling on the release and Stipulation in the Related Action.

[2] This assumes, of course, that Cappseals' judgment was properly granted by the Court in the first instance. ITV has appealed Cappseals' judgment (First Circuit Docket No. 05-2323) with oral argument scheduled for February 6, 2006, less than two weeks from now. Ironically, in the appeal, Cappseals seeks to use the Stipulation, which it now argues is ineffective, to argue that the appellate issues raised by ITV are moot, as ITV received the relief it sought through the original stipulation. In other words, for the appeal, the Stipulation is valid; in this case, it should not be given effect.

judgment on theories never asserted in the Related Action or, in the case of its co-obligor theory, on a theory not even contained in its complaint. Nothing prevented Cappseals from bringing DMC into the Related Action and asserting its co-obligor and alter ego theories in that action before it sought summary judgment against ITV on its reach and apply claim. Cappseals chose to pursue and take a judgment against ITV; having done so, it may not now proceed to prosecute a derivative claim that has been merged with the judgment and was otherwise released by Healthy Solutions.

Moreover, Cappseals' fraud on the Court argument is entirely a red herring. Cappseals in fact opposed the Stipulation, expressly taking issue with the statement that no rights would be affected and noting that "the Judgment Debtors have refused to pay their debt and now want the Court to endorse a stipulation that would allow them to alienate assets and render Cappseals' judgments forever uncollectible." (See Cappseals, Inc.'s Objection to the Stipulation for Mutual Dismissal filed by the Judgment Debtors, at p. 2, filed on September 15, 2005.) The Court approved the Stipulation on October 24, 2005, and at the same time, entered an order restraining ITV and Direct Fulfillment from alienating assets.[3] Notably, Cappseals did not appeal from the Court's order allowing the Stipulation.

In sum, DMC cannot be estopped from raising its defenses in this action by an assertion made by ITV and Healthy Solutions in the Stipulation in the Related Action, an assertion that was true when filed and becomes problematic for Cappseals only because it has filed a new action seeking to pursue claims that have been merged and released.[4]

---

[3] The order restrained ITV and Direct Fulfillment from "removing, transferring, disposing of, wasting, liquidating, investing, conveying, encumbering in any fashion, or attempting to remove, conceal, or in any way interfere with any real or personal property, assets, effect, or funds in any bank, except as may be necessary for the usual day-to-day operations of the business."

[4] In re Sanborn, Inc., 181 B.R. 683 (Bkrtcy. D. Mass. 1995), cited by Cappseals (Reply at p. 4) is completely inapposite. That case involved a motion by Hampshire Realty Trust ("HRT") to require the debtor Sanborn, Inc.

**B. Cappseals' Alter Ego Claim Does Not Survive The Judgment In The Related Action.**

Cappseals next argues that, notwithstanding the Release and Stipulation, it is not barred from raising an alter ego claim against DMC. Cappseals asserts that a judgment creditor has a right to raise an alter ego claim in a second suit in order to collect a judgment from a party not named in the prior judgment. (Reply at 5 citing C.F. Trust, Inc. v. First Flight Ltd. Partnership, 140 F. Supp. 2d 628, 645 (E.D. Va. 2001) ("First Flight"), question certified in 306 F.3d 126 (4th Cir. 2002), affirmed 338 F.3d 316 (4th Cir. 2003) and H.H. Robertson Co., Cupples Products Division v. V.S. DiCarlo Gen Contractors, 994 F.2d 476 (8th Cir. 1993) ("Robertson").) Both of the cases relied on by Cappseals, First Flight and Robertson, are distinguishable and demonstrate the problems with Cappseals' alter ego claims against DMC.

In First Flight, the plaintiff C.F. Trust obtained a judgment on promissory notes against Barrie Peterson for $6 million. 140 F. Supp. 2d. at 629-630. Another lender, Atlantic Funding also obtained a judgment against Barrie Peterson for $1.2 million. Id. at 630. Both lenders obtained charging orders attaching Peterson's interests in various controlled entities, including First Flight. Id. After the judgments and charging orders, Peterson transferred 50% of his interest in First Flight to his son Scott for nominal consideration. Thereafter, Barrie Peterson caused First Flight to make a distribution of $4.3 million to Scott, half of which should have

("Sanborn") to surrender possession of certain property and to perform lease obligations. In pertinent part, in October 1992, Sanborn, HRT and its trustee Mark Henry (Henry"), among others, entered into an agreement to modify their obligations under certain prior agreements made in January 1992, and also exchanged mutual releases. Id. at 686. Under the amendments, HRT was to receive a payment from Sanborn of $177,000. In the interim, the Massachusetts Superior Court had issued an injunction in an action commenced by Northeast Petroleum against Henry as a defendant and Sanborn as a reach and apply defendant. HRT, however, was not subject to the injunction. The court found that HRT could not enforce its claim for rent against the debtor because it had unclean hands based on the October agreement which the court found to be an illegal contract entered into to avoid the state court's injunction. That Sanborn was a party to the illegal contract was not imputed to its status as a debtor in possession. Id. at 691 n. 15. In short, the issues in Sanborn have nothing to do with the legal effect of a stipulation of dismissal or the impairment of the rights of a reach and apply defendant, who was not involved in the case. The Stipulation in the Related Case was not unlawful or improper in any way, and certainly was not intended to avoid a judgment in favor of Cappseals that in fact had already entered. As noted, ITV could not possibly have known that Cappseals would initiate a new suit against DMC.

been distributed pursuant to the partnership agreement to Barrie. Id. at 634. The improper distribution thus avoided the charging order on Barrie Peterson's partnership distributions which would have been used to satisfy in part C.F. Trust's judgment. Instead, money was funneled into another related entity, BHG, which provided management and administrative services to the entities owned and controlled by Barrie and Scott Peterson. Id. at 637. Ultimately BHG paid approximately $2 million of Barrie Peterson's personal expenses. Id. at 636-639. In short, as the court noted, Barrie Peterson devised and executed a scheme to enable BHG to pay his personal expenses and thus to evade the judgments and charging orders. Id. at 636. As such, the court found that "[b]ecause Barrie Peterson used the entities he owns and controls as part of his scheme to evade payment of plaintiffs' judgments, an action to pierce the veil in reverse is justified by the facts of the case at bar." Id. at 643.[5]

This is not a case where Cappseals has alleged in its complaint and has established a summary judgment record of a scheme on the part of ITV to avoid paying the judgment by transferring assets to another entity or person or by the payment of distributions by ITV to shareholders. Indeed, as noted, both ITV and DMC have been under an order in the FTC Action since June 2004 requiring the financial reporting of transfers and expenditures, and Cappseals makes no claim of any evidence in that action that either company has secreted assets. As its summary judgment motion makes clear, Cappseals' argument centers on pre-judgment conduct; that is (i) that DMC sent the same purchase order as ITV to Healthy Solutions for the purchase of Supreme Greens and thus was a co-obligor to Healthy Solutions (see Cappseals' Memorandum in Support of Motion for Partial Summary Judgment at 3-4, 10-12) and (ii) that ITV acted merely

[5] As the Fourth Circuit noted in its review of the district court judgment, in a traditional veil piercing case the creditor of a corporation seeks to reach the assets of a corporate shareholder or director; reverse veil piercing permits a creditor to satisfy the debts of an individual out of corporate assets. See First Flight, 306 F.3d at 134.

as a pass-through entity for DMC. (Cappseals' Memorandum at pp. 4-7.) None of these issues concerns post-judgment conduct aimed at avoiding the payment of Cappseals' judgment.

The most that Cappseals alleges is that after the judgment ITV supposedly ceased doing business, id. at 7, although Cappseals fails to acknowledge the effect of FTC litigation, which primarily concerned Supreme Greens, on ITV's business. This supposed cessation of business is what Cappseals points to as the "siphoning of ITV's funds by the dominant shareholders." Id. at 18. How the mere cessation of business caused by the FTC litigation constitutes the siphoning of assets or is analogous to the post-judgment scheme to divert assets in First Flight is not explained.

Robertson also does not advance Cappseals' arguments. In that case, the judgment creditor Robertson brought a creditor's bill in equity seeking to hold two related corporations, DiCarlo Construction Company and Delta Equipment Company, of the debtor V.S. DiCarlo General Contractors, Inc, liable as garnishees. 994 F.2d at 477. After the judgment, substantially all of V.S. DiCarlo's assets were transferred to DiCarlo Construction and Delta. Id. The court ruled that under Missouri law there was no requirement in a creditor's bill that the garnishees be named in the underlying action. Id. at 478. While Massachusetts also recognizes a creditor's bill, Foster v. Evans, 384 Mass. 687 (1981), the Foster case establishes that such equitable relief applies to a judgment creditor who alleges that a judgment cannot be satisfied because the debtor has fraudulently transferred assets to a third party. Id. at 694; see also G.L. c. 215 § 6. Cappseals' complaint in this action is not framed as a creditor's bill, and although Cappseals has asserted a fraudulent transfer claim, it has not sought summary judgment on that claim.

It is clear that Cappseals' alter ego claim is not grounded in any post-judgment conduct by ITV or DMC, but rather is grounded in allegations that are based on the same underlying debt

and breach of contract claim that were at issue between Healthy Solutions and ITV in the Related Action. As established in DMC's opposition, that cause of action merged into the judgment that Cappseals chose to pursue and was otherwise extinguished by the Release and Stipulation.

**C. DMC Is Entitled To Judgment As A Matter Of Law On Cappseals' Co-Obligor And Alter Ego Claims Based On The Doctrine Of Merger.**

As DMC established in its opposition, the doctrine of merger bars Cappseals' co-obligor and alter ego claims in this action. A cause of action, when reduced to a judgment, ceases to exist as an independent liability. The judgment is an absolute merger of a debt by simple contract, so that no action can afterwards be maintained upon the original promise.[6] See, e.g., Frost v. Thompson, 219 Mass. 360, 367 (1914); Moore v. Justices of Municipal Court of City of Boston, 291 Mass. 504, 505 (1935); Lonnqvist v. Lammi, 242 Mass. 574, 577-78 (1922).[7] As the courts in Frost and Moore noted, the doctrine of merger is fully established and has been extended "very far" in Massachusetts. See Frost, 219 Mass. at 367-68; Moore, 291 Mass. at 505.

To avoid the merger doctrine, Cappseals relies on a number of cases outside of Massachusetts and asks this Court not to apply the doctrine as a matter of general equity because DMC has allegedly attempted to hinder and delay its right to collect on the judgment and because of the alleged misrepresentation concerning the effect of the Release and Stipulation. (Reply at 6.) As noted, there is no merit to these arguments, and the cases cited by Cappseals are not remotely analogous to the situation in this case.

---

[6] As noted, it is the facts surrounding the transaction or occurrence that operate to constitute the cause of action, not the legal theory upon which the litigant relies. TLT Const. Corp. v. A. Anthony Tappe and Associates, Inc., 48 Mass. App. Ct. 1, 7 (Mass. App. 1999) ("The statement of a different form of liability is not a different cause of action provided it grows out of the same transaction, act, agreement, and seeks redress for the same wrong."). Thus, Cappseals cannot avoid application of the merger doctrine by relying on an alter ego claim that is derived from the same transaction which gave rise to its judgment.

[7] Cappseals attempts to distinguish Lonnqvist by noting that that case did not involve an alter ego claim. Reply at 6 n. 5. But this is mixing apples and oranges. Cappseals does not explain how an alter ego claim somehow revives a debt that was extinguished and merged into a reach and apply judgment. It does not cite a case for this unusual proposition.

For example, in United States v. Ringley, 750 F. Supp. 750 (W.D. Va. 1990), a case cited by Cappseals that was decided under federal law, the United States had obtained a judgment against a partnership for failure to pay federal reclamation fees under the Surface Mining Control and Reclamation Act. Because the judgment against the partnership was unsatisfied, the government then filed a second action against the individual partners of the partnership. The court declined to follow the merger law of Virginia, which the court found would bar the government's second action, id. at 754-55, and instead relied on an exception to the merger doctrine under federal law that allowed claim splitting where enforcement of the judgment in the first action would be plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme. Id. at 756-57. The court found that having chosen to do business in partnership form, the partners could not avoid personal liability for partnership debts based on the merger doctrine. Id. at 757. Aside from the fact that in this case, as a diversity action, Massachusetts law applies,[8] there is no statutory or constitutional scheme that would be impeded by applying the merger doctrine. The court in Ringley did not apply an alter ego theory, but rather simply applied the common law rule that partners are liable for partnership debts.

Cappseals also cites to Orix Credit Alliance, Inc. v. Horten, 965 F. Supp. 481 (S.D.N.Y. 1997), in which the court applied New York law and found that plaintiff's claim against defendant guarantors was time-barred. The plaintiff, Credit Alliance's predecessor-in-interest, had previously obtained a judgment against the debtor (U.S. Roofing) for breach of a lease of a crane. To avoid the statute of limitations, Credit Alliance argued that its suit on the guaranty for the debtor was not based on the original lease obligations, but rather the subsequent judgment

---

[8] See Birbara v. Locke, 99 F.3d 1233, 1237 (1st Cir. 1996).

obtained. Id. at 485. Under the merger doctrine, Credit Alliance argued that the original claim was extinguished and merged into the judgment; accordingly, its suit was timely. Id. The court rejected Credit Alliance's argument, noting that its prior judgment against the debtor did not create an entirely new debt that served to restart the limitations period against the guarantors. Id. at 487. This case is easily distinguishable, as the court in Orix Credit Alliance found that the merger doctrine simply did not apply to the separate liability of the guarantors. What was merged in the judgment were the obligations of the debtor, not the guarantors. As the guaranty applied to the original debt, the limitations period was triggered by the debtor's original default; accordingly, the claim against the guarantors was timebarred.

In United States v. Peckham, 72 F.3d 672 (8th Cir. 1995), also cited by Cappseals, the merger doctrine did not apply at all. At issue was simply a motion by the government to alter and amend a judgment to contest whether certain costs were reimbursable under the foreclosure judgment at issue. Similarly, the issue in Cutler Hardware Co. v. Hacker, 238 F. 146 (8th Cir. 1916) had to do with the priority of distributions in bankruptcy for creditors of partnership obligations where it was found that prior judgments against the partners did not alter the general rule of distribution recognized in the cases of insolvent partnerships. Likewise, Burke v. Burke, 86 A.2d 51 (Del. Ch. 1952), involved enforcement of a separation agreement that was found not to have been merged into the judgment of divorce, where the separation agreement provided for more than the payment of money. Cappseals does not explain how any of these cases remotely support its position.

Finally, Byram v. Miner, 47 F.2d 112 (8th Cir. 1931), involved the issue of whether the lien of an attorney representing a client in three personal injury actions in Minnesota survived the unilateral settlement of claims by the client and the claims agent for the defendant railroad

company. For the purpose of settlement, and as directed by the claims agent (without the knowledge of the client's counsel), the client initiated identical actions to the Minnesota actions in South Dakota. Judgment against the railroad company was entered in the South Dakota actions and satisfied by the claims agent. Id. at 113. The Minnesota actions were subsequently dismissed on the basis of the South Dakota judgments.

Subsequently, the attorneys for the client were allowed to reopen the South Dakota judgments for the purpose of intervening to assert their liens. Id. at 114. The defendants argued that the South Dakota judgments merged the causes of actions sued upon, and that the attorney's liens ceased to exist when the causes of action merged into the judgments. Id. at 119. The court found that the intervention was not a collateral attack on the South Dakota judgments, which were valid and enforceable between the plaintiff and defendant, and that the sole purpose of the South Dakota judgments was an attempt to avoid the settlement and discharge of the attorney's liens. Id. Again, as in Orix Credit Alliance, the client's liability for the attorney's lien was independent of the substantive claims that were settled and compromised by the client and railroad and, thus, were not subject to the merger doctrine.

In sum, the circumstances in this case are completely inapposite of those cases relied on by Cappseals. The co-obligor and alter ego claims now advanced by Cappseals arise out of the same operative facts and obligations from which Cappseals chose to take its reach and apply judgment; as those claims have no independent viability, unlike the claims in Orix Credit Alliance and Byram, they are subject to the merger doctrine.

**D. Cappseals Is Not Entitled To Summary Judgment On Its Alter Ego Claim.**

As the First Circuit has noted in Crane v. Green & Freedman Baking Co., 134 F.3d 17 (1st Cir. 1998), the legal standard for piercing the corporate veil is fact intensive and among the

most confusing in corporate law. Id. at 21. "Even where veil-piercing is decided by a judge rather than a jury, the courts have held that the question, while equitable, is one of fact." Id. (citations omitted). Thus, whether ITV and DMC are alter egos, and whether Cappseals is entitled to pierce ITV's corporate veil, are determinations of fact based upon all of the evidence, under the standards articulated in Evans v. Multicon Const. Corp., 30 Mass. App. Ct. 728, 732 (1991) and Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985).[9]

In its original memorandum of law, Cappseals provided little substantive evidence in support of its alter ego claim. Of the twelve factors listed in Evans and Pepsi-Cola, Cappseals only engaged in a cursory discussion of six: common ownership, pervasive control, confused intermingling of assets, non-observance of corporate formalities, siphoning of assets and use of the corporation to promote fraud. (Cappseals Memorandum at 16-18.) Cappseals did not adduce any evidence or make any argument on the remaining criteria.

Other than common ownership and control (there is no dispute that Donald Barrett and Robert Maihos own and control ITV and DMC), Cappseals' proffered evidence of the other four factors it discusses is marginal at best, and in the main largely deceptive and irrelevant. On "confused intermingling," for example, Cappseals relies on certain observations made by the District Court in the FTC Action. Cappseals states that the District Court found that Barrett and Maihos have dissipated assets by requesting that third parties "send hundreds of thousands of dollars directly to Barrett instead of to DMC," and that a third party sent "hundreds of thousands

[9] In general, courts weigh twelve criteria: (1) common ownership; (2) pervasive control; (3) confused intermingling or business activity assets or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporations for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud. Evans, 30 Mass. App. Ct. at 733, citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985).

of dollars to a separate company controlled by Barrett rather than DMC." (Cappseals' Memorandum at 17 citing the Preliminary Injunction Order, ¶13.[10]) Notwithstanding that neither allegation involves ITV, and these transactions occurred *before ITV was even incorporated*, these allegations plainly distort what the District Court actually determined. After setting forth the allegations asserted by the FTC in the form of affidavits, (which are the allegations cited by Cappseals), the District Court notes in paragraph 17 of its order:

> Defendants contend that the declarants relied on by the FTC are biased and untrustworthy and that their statements are false. It is difficult to make a credibility assessment on the basis of affidavits alone. **Defendants make a plausible showing of bias**. Nevertheless, even disregarding the most accusatory assertions, some of which are conclusory, the statements do show at least an ability on the part of defendants to move assets among related entities and/or assets. (emphasis added.)

The District Court in the FTC Action hardly credited the allegations relied on by Cappseals to establish intermingling of assets, and they certainly do not constitute undisputed findings of fact by the District Court for the purposes of summary judgment in this action. Further, that DMC initially funded the media buys purchased by ITV is not disputed, but how this establishes a confused intermingling or the dissipation of assets is not explained by Cappseals.

On non-observance of corporate formalities, the only evidence relied on by Cappseals is some evidence that both ITV and DMC issued purchase orders to Healthy Solutions. Again, even assuming that the purchase orders DMC issued were not a mistake, such evidence hardly establishes that ITV and DMC did not appropriately observe corporate formalities. In any event, as noted, the evidence is clear that Healthy Solutions was not confused by the purchase orders. Contrary to Cappseals' assertion that Healthy Solutions believed both ITV and DMC were liable for payment, (Cappseals' Memorandum at 15), Healthy Solutions did not sue DMC on the debt

[10] The Preliminary Injunction Order is attached to the Affidavit of Scott Silverman, submitted by Cappseals in support of its motion for summary judgment, as Exhibit H.

and never took any steps to collect the debt from DMC. Nonetheless, Cappseals now seeks to elevate its rights above those asserted by Healthy Solutions.

As for siphoning assets, Cappseals' complaint is that ITV's business ceased after the judgment was issued in the Related Action; however, it does not present any admissible and concrete evidence of improper payments by ITV to Barrett, Maihos or any other third party. Finally, as to promoting fraud, the only evidence claimed by Cappseals is the so-called deceptive advertising of Supreme Greens at issue in the FTC Action. Not only is the issue of deception hotly contested in the FTC Action, as the First Circuit made clear in Birbara v. Locke, 99 F.3d 1233, 1240 (1st Cir. 1996), the fraudulent or injurious consequences must deal with the intercorporate relationship, not some unrelated issue. Whether consumers were deceived by the Supreme Greens infomercials has absolutely nothing to do with the relationship between ITV and DMC or whether any financial misconduct has occurred between the two entities.[11]

Based on this "evidence," Cappseals asks the Court to decide as a matter of law that DMC and ITV are alter egos under the operative test in My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968) and the criteria in Evans and Pepsi-Cola.[12] In its Reply, instead of explaining why the aforementioned "evidence" is sufficient for summary judgment, Cappseals takes aim at the affidavits of Wayne Callahan and Donald Barrett who, in opposition

---

[11] In fact, only this past week Judge O'Toole denied the FTC's motion to amend the existing preliminary injunction, noting that the FTC had not made any allegation, nor was there any evidence of financial improprieties, fraudulent transfers of assets or any similar financial misconduct. See FTC v. Direct Marketing Concepts, Inc., 2006 WL 149039, at *3 (D. Mass. Jan. 19, 2006) ("The FTC does not argue that a receiver is necessary to steward the financial affairs of the defendants' business or to prevent the dissipation or hiding of assets").

[12] Disregarding the corporate structure to impose liability under My Bread Baking is only available "when (1) there is an active and pervasive control of related business entities by the same controlling persons and there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or (2) there is a 'confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." See Evans, 30 Mass. App. Ct. at 732-33 (emphasis in original).

to Cappseals' motion, averred that DMC advanced funds to ITV to purchase media for the promotion of Supreme Greens and that as security for the advances, the inventory of Supreme Greens was carried on the books of DMC. In opposition, Cappseals argues that ITV was merely a pass-through vehicle for DMC, submitting in support the affidavit of Andrew Prague, an accountant, who avers that he has been retained by Cappseals "to assess and provide opinions on some of the statements and conclusions" made by Callahan and Barrett. (Prague Aff., ¶4.) Prague then proceeds to disparage and give opinions on the credibility of statements made by Callahan and Barrett. For example, Prague exclaims that Callahan's statements are "completely false" and are "ludicrous on their face and absurd." (Prague Aff., ¶¶ 17-18.) Similarly, on several occasions, Prague opines that statements by Barrett are belied or contradicted by the financial records.[13] (Prague Aff., ¶¶13, 14.) Clearly, Prague and Cappseals ask the Court to weigh the evidence and make credibility determinations, both of which are not appropriate on a motion for summary judgment. Mahan v. Boston Water & Sewer Comm'n., 179 F.R.D. 49, 56 (D.Mass. 1998).

At bottom, Cappseals' argument that ITV was merely a pass-through for DMC rests on its contention that the financial records show no evidence of loans or liability on the part of ITV to DMC with respect to the advance of funds to pay for the media buys. (Reply at 11 & 17.) In his affidavit, Barrett stated that at the time ITV entered into the distribution agreement with Healthy Solutions (in April 2003), the business plan and forecast for ITV anticipated that ITV would repay all amounts owed to DMC. (Barrett Aff., ¶¶ 3, 5.) Because the Supreme Greens

[13] While Cappseals has had the opportunity to depose Mr. Callahan, the defendants have not had the opportunity to depose Mr. Prague. In short, there is a genuine dispute between Mr. Callahan and Mr. Prague, two accountants, regarding the import of the financial statement entries in ITV's and DMC's books and records. This dispute is clearly material and requires denial of the summary judgment motion.

infomercial was cut short by the intervention of the FTC and FDA, the Supreme Greens infomercials never recouped the upfront costs lent by DMC. (Id., ¶ 5.)

Contrary to Cappseals' position, there is evidence in the records demonstrating that ITV owed DMC significant funds for the Supreme Greens infomercials, and properly recorded a liability. In the FTC Action, as part of his preliminary injunction order, Judge O'Toole required an accounting of the assets of Barrett, DMC and ITV. (See Preliminary Injunction Order, pp. 24-26.) This accounting, dated August 16, 2004, was created under the control and supervision of Pannell, Kerr Foster P.C. ("PKF"), an independent accounting firm, and utilized procedures agreed to by the FTC and DMC.[14] In pertinent part, the balance sheet for ITV as of June 30, 2004 lists among its liabilities, $8,329,970 owed to DMC. (See Exhibit F to Silverman Aff., at ITV 000567.) PKF notes in its findings that the balance sheet of DMC did not contain a corresponding line item; instead, the corresponding amounts were included in cost of sales. (Id. at ITV 00546.) Thus, well before Cappseals initiated the instant action against DMC, there was evidence in the records of ITV demonstrating a substantial liability on ITV's part owed to DMC arising out of the Supreme Greens advertising. This is hardly "sham" evidence, in Cappseals' words, somehow manufactured to avoid summary judgment in this case, but demonstrates the reality that ITV functioned like any other small "start-up" business in 2003, requiring funds to operate and maintain the business, while seeking to one day operate in the black. That never happened, because of Healthy Solutions' misrepresentations and fraud, which Cappseals painstakingly seeks to ignore and avoid in its arguments for reaching beyond the contracting

[14] The accounting is attached to the Silverman Affidavit as Exhibit F.

party, ITV, to reach another entity that was never sued by Healthy Solutions, and from which Healthy Solutions never sought to recoup its alleged debt.[15]

In any event, focusing on this issue misses the forest for the trees. Cappseals is not entitled to summary judgment on its alter ego claim merely based on the quantity or quality of evidence, or lack thereof, of a debt owed by ITV to DMC arising out of the Supreme Greens infomercials. There are twelve factors to be considered in reaching a determination that it is appropriate to pierce a corporate veil, and other than common ownership and control, Cappseals fails to provide competent, undisputed and unequivocal evidence to establish the other ten factors. Even assuming that the Court could, as fact finder, determine that there was some intermingling of ITV and DMC's business activities, there has been no evidence of thin capitalization, nonobservance of corporate formalities, absence of corporate records, nonpayment of dividends, insolvency at the time of the litigated transaction, siphoning of corporate funds by dominant shareholders,[16] nonfunctioning of officers, use of the corporation for transactions of the

---

[15] Cappseals spends a great deal of time arguing that the affidavits of Barrett and Callahan should be disregarded because they are contradicted by their prior deposition testimony. (Reply at 18-22.) The rule is that when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory. Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994). Nothing quoted from the depositions of Callahan and Barrett establish **unambiguous questions** and **clear answers** that in any way contradict the existence of a debt owed by ITV to DMC. In the first quote, Callahan simply acknowledges the net revenues of DMC are reflected in a document prepared under the procedures established by PKF. (Reply at 19.) Cappseals does not cite any questions dealing with loans to or debt owed by ITV. Further, Callahan's response at his deposition that he did not know the other businesses of ITV (Reply at 19) does not establish that ITV's only business was to buy media. Similarly, Barrett's deposition testimony on how he came up with ITV's name or that employees are paid by DMC (Reply at 21) does not contradict the statement, as Cappseals contends, that ITV was promoting Supreme Greens and was in the business of producing infomercials. Indeed, on the latter point, ITV's 2004 tax return, attached to Prague's affidavit as Exhibit H, evidences costs for infomercial production, including the purchase of computers, software and studio equipment. (Id. at ITV 00045-00046.)

[16] The District Court in the FTC Action required the accounting to include a listing of transfers by ITV over $10,000. That listing reflects only seven transfers from March through December 2003, four to DMC, one to Healthy Solutions, and two to Maihos. (See Exhibit F to Silverman Aff. at ITV 000563.) This hardly evidences a siphoning of assets. In fact, the document reflects that ITV did make payments to Healthy Solutions, which eviscerates Cappseals argument that no such payments were ever made. It should also be noted that Judge O'Toole's preliminary injunction order enjoined DMC and ITV from transferring assets other than in the ordinary

dominant shareholders or use of the corporation in promoting fraud.[17] See Pepsi-Cola, 754 F.2d at 14-16. And while, as the Appeals Court noted in Evans, the exercise of weighing the factors is not merely a matter of counting, the lack of concrete and pertinent evidence on so many factors must be found to foreclose judgment as a matter of law on Cappseals' claim. The cases are clear that piercing the corporate veil is justified only in rare circumstances. The cases where piercing the corporate veil has been found justified are cases based on a full trial record, and not, as here, on a summary judgment record, let alone one that is purposefully deceptive on much of the evidence.

**CONCLUSION**

For the reasons herein, and in DMC's opposition, Cappseals' motion for partial summary judgment against DMC must be denied.

Respectfully submitted,
DIRECT MARKETING CONCEPTS, INC.

By its attorney(s),

/s/ Susan W. Gelwick

Peter S. Brooks, BBO #058980
Susan W. Gelwick, BBO #567115
Christopher F. Robertson, BBO #642094
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone: (617) 946-4800
Telecopier: (617) 946-4801

Dated: January 30, 2006

---

course of business and to produce to the FTC on a monthly basis all documents reflecting transfers over $5,000. (Preliminary Injunction Order, pp. 26-28.)

[17] Cappseals does not argue these other factors because it know that they are dead on arrival. Both ITV and DMC have been operating under a federal court injunction prohibiting any fraudulent transfers or activities outside the "ordinary course of business" since June 2004. As noted by Judge O'Toole, the FTC has not alleged that any such conduct has occurred since that time.